IN RE the TERMINATION OF PARENTAL RIGHTS TO
GWENEVERE T., a person under the age of 18:

TAMMY W-G., Petitioner-Respondent,

v.

JACOB T., Respondent-Appellant.

Supreme Court

*No. 2009AP2973. Oral argument October 1, 2010.
—Decided May 17, 2011.*

2011 WI 30

(Also reported in 797 N.W.2d 854.)

274

For the respondent-appellant there were briefs and oral argument by *Eileen A. Hirsch,* assistant state public defender.

For the petitioner-respondent there were briefs and oral argument by *Nathaniel W. Curry, Kopp McKichan, LLP,* Platteville.

A guardian ad-litem brief was filed by *Ryan K. Dalton, McNamara, Reinicke, & Vogelsberg LLP,* Lancaster, and oral argument by *Ryan K. Dalton.*

An amicus curiae brief was filed by *Winn Collins, Green Lake County District Attorney,* Green Lake, and *Elisabeth A. Mueller, assistant Milwaukee County district attorney,* Wauwatosa for Wisconsin District Attorneys Association.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This case comes before us by certification from the court of appeals. Certification was recommended to "resolve the ambiguities and uncertainties regarding the use of Wis. Stat. § 48.415(6) as a ground to terminate parental rights." *Tammy W-G. v. Jacob T.,* No. 2009AP2973, unpublished slip op., at 11 (Wis. Ct. App. Apr. 22, 2010). The certified questions are:

> (1) Whether "once a 'substantial parental relationship' is established, the relevant time period ends and subsequent events are not relevant to the issue of a substantial parental relationship";

> (2) "whether a fact-finder may determine that, despite significant parenting, poor quality parenting is a reason to find that a 'substantial parental relationship' has not been established"; and

> (3) Whether our interpretation of Wis. Stat. § 48.415(6) as it relates to the preceding two issues "comports with the constitutional protections afforded parents."

279

¶ 2. In addition, Jacob argues that: (1) the circuit court erred when it denied his motion for a directed verdict, and (2) he should be granted a new trial in the interest of justice because the jury instruction was incomplete and inaccurate.

¶ 3. We conclude that Wis. Stat. § 48.415(6) (2007–08)[1] prescribes a totality-of-the-circumstances test. When applying this test, the fact-finder should consider any support or care, or lack thereof, the parent provided the child throughout the child's entire life. This analysis may include the reasons why a parent was not caring for or supporting her child and exposure of the child to a hazardous living environment. We further conclude that the statute was not unconstitutional as applied to Jacob. Finally, the circuit court did not err when it denied Jacob's motion for a directed verdict and Jacob waived his argument that the jury instruction was improper. Accordingly, Jacob's parental rights were lawfully terminated; we affirm the judgment of the circuit court.

## I. BACKGROUND

¶ 4. Gwenevere was born to Tammy W-G. (Tammy) and Jacob T. (Jacob) in mid-January of 2005. Tammy and Jacob lived together for approximately a year before Gwenevere was born. During Tammy's pregnancy, Jacob left his job to take care of Tammy who was on "extreme bed rest." Moreover, he accompanied Tammy to doctor appointments, was at Gwenevere's delivery, and was excited about the baby.

¶ 5. For the first two months of Gwenevere's life, Tammy and Jacob were both home full-time, but then

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

Tammy returned to work. In the following two months (approximately months three and four of Gwenevere's life), Jacob was, as Tammy phrased it, a "stay at home dad." During the first four months of her life, Jacob participated in feeding, changing, and otherwise caring for Gwenevere. In addition, both he and Tammy took Gwenevere to her doctor's appointments. However, Tammy testified that when she came home from work, she would take Gwenevere to the bedroom for the night because the house was a mess, there was mildew covering the dishes, and beer cans in the living room. In 2005, Jacob and Tammy agreed to move from Minnesota to Illinois. However, in May 2005, only Jacob moved to Illinois. Tammy moved into the home of Douglas G. (Douglas), whom she subsequently married.

¶ 6. At the time of their separation, Jacob and Tammy agreed to a custody plan in which Gwenevere would spend two months with Tammy, followed by two months with Jacob. However, Tammy testified that she refused to go through with the plan because of concerns about Jacob's alcohol abuse and "drug paraphernalia"[2] and the effect this could have on Gwenevere's safety.

¶ 7. Following Jacob's May 2005 relocation to Illinois, he had little contact with Gwenevere. He drove from his home in Illinois to Minnesota to visit Gwenevere either two or three times[3] between 2005 and 2006. The first visit was in either July or August of 2005. The visit lasted approximately one-and-a-half hours.

---

[2] Tammy's concerns regarding Jacob's drug abuse related to his use of marijuana. There is no evidence Jacob used other, "harder" drugs.

[3] As discussed below, there is conflict in the trial testimony about whether there were two or three visits.

¶ 8. Tammy testified that Jacob's second visit was in July of 2006. Tammy could not recall how long that visitation lasted. Jacob, however, did not mention this visit in his testimony and asserted that there have been only two visits since he moved to Illinois. Jacob and Tammy both testified that there was a final visit with Gwenevere in November of 2006. There is no evidence that the second and third visits were of any substantial length. Jacob has not had in-person contact with Gwenevere since that time.

¶ 9. Between July of 2005 and November of 2006, Jacob testified that he called Tammy with regard to Gwenevere, but that his calls were "random." Specifically, Jacob said he "didn't do it like every week or every two weeks." Moreover, Jacob testified that he spoke with Gwenevere on the phone two to three times between 2007 and 2008; however, Tammy did not recall any contact, via phone or otherwise, between Jacob and Gwenevere in 2007. Throughout this time, Tammy updated Jacob when her contact information changed. Of note, in 2006, Tammy, Douglas, Gwenevere, and the couple's other two daughters moved to a city in southwest Wisconsin only two hours from Jacob's Illinois residence. Jacob was aware of their relocation.

¶ 10. Jacob explained that his lack of contact with Gwenevere from the summer of 2005 up until trial was not the result of Tammy's refusal to let him see Gwenevere, but rather her condition that these visits be supervised. Specifically, Tammy required that Jacob's visits with Gwenevere be supervised by Tammy, Douglas, or someone that Jacob hired.[4]

---

[4] At trial, Jacob asserted that instead of abiding by Tammy's conditions in order to see his daughter, his plan was to save up enough money to hire an attorney to take Tammy to court and challenge her conditions.

¶ 11. Since Jacob's move to Illinois in 2005, he has not provided any financial or material support for Gwenevere. He has never paid child support to Tammy for Gwenevere's care or taken steps to set up child support. Jacob did testify that he offered money to Tammy for Gwenevere's care after the two split, but that she refused his offer.[5] Jacob admitted that he did not know who Gwenevere's pediatrician was, what school she was attending or her teacher's name. Additionally, he has never sought assistance from the courts to have contact or placement. Except during the first four months of Gwenevere's life when Tammy and Jacob lived together, Jacob has never taken Gwenevere to her doctor appointments.

¶ 12. Jacob's final contact with Gwenevere before the August 2009 fact-finding hearing was a call in mid-January 2009 on Gwenevere's fourth birthday. During this call, Tammy and Jacob discussed a potential visit in February that never took place. Tammy also told Jacob she wanted to have Jacob's rights terminated so that Douglas could adopt Gwenevere.

¶ 13. On April 8, 2009, Tammy filed a petition in Grant County Circuit Court to terminate Jacob's parental rights. The petition was amended on May 20, 2009. It claimed Jacob's rights should be terminated because he had failed to assume parental responsibility as defined in Wis. Stat. § 48.415(6). A fact-finding hearing was heard by a jury on August 13 and 14 of 2009.

[5] When first asked at trial if Jacob or his cousin offered to pay child support during Jacob's first visit with Gwenevere, Tammy testified that someone "might have said something, but I can't remember." She later acknowledged that Jacob might have offered her $150. Ivan, Jacob's cousin, who witnessed this visit, testified that Jacob offered her $200 and also offered to buy diapers and clothes, but Tammy refused.

¶ 14. At the close of the fact-finding hearing, the circuit court denied motions from each party for a directed verdict and, instead, instructed the jury to determine if Jacob assumed parental responsibility for Gwenevere. Neither party objected to the jury instructions, which instructed the jury to answer a special verdict question: "Has Jacob [] failed to assume parental responsibility for Gwenevere []?" The jury answered "yes" by a vote of eleven to one. Subsequently, on September 10, 2009, at the dispositional hearing, the circuit court terminated Jacob's parental rights.

¶ 15. Jacob appealed the termination of his parental rights to the Wisconsin Court of Appeals. The court of appeals determined that its holding in *State v. Quinsanna D.*, 2002 WI App 318, 259 Wis. 2d 429, 655 N.W.2d 752, prevented it "from interpreting Wis. Stat. § 48.415(6) in a manner that is consistent both with the language of the statute and constitutional protections accorded parental rights." *Tammy W-G.*, No. 2009AP2973, at 2. Therefore, the court of appeals certified the appeal, which we accepted pursuant to Wis. Stat. § 808.05.[6] We now affirm the decision of the circuit court.

## II. DISCUSSION

### A. Standard of Review

¶ 16. The interpretation of Wis. Stat. § 48.415(6) and the application of that statute to a given set of facts

---

[6] Wisconsin Stat. § 808.05(2) provides in relevant part: The supreme court may take jurisdiction of an appeal or any other proceeding pending in the court of appeals if: . . . [i]t grants direct review upon certification from the court of appeals prior to the court of appeals hearing and deciding the matter . . . ."

are questions of law that we review independently. *Marder v. Bd. of Regents of the Univ. of Wis. Sys.*, 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110. Whether a statute and the application of a statute are constitutional are also questions of law that we review independently. *Dane Cnty. Dep't of Human Servs. v. Ponn P.*, 2005 WI 32, ¶ 14, 279 Wis. 2d 169, 694 N.W.2d 344.

■

¶ 17. We examine as a question of law whether the circuit court properly refused to grant a directed verdict. *See Bubb v. Brusky*, 2009 WI 91, ¶ 30, 321 Wis. 2d 1, 768 N.W.2d 903. We independently review, as a question of law, whether the evidence is sufficient to support the jury's verdict. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W. 752 (1990).

B. Wisconsin Stat. § 48.415(6):
Failure to Assume Parental Responsibility

a. Termination of parental rights proceedings

¶ 18. A brief overview of termination of parental rights proceedings in Wisconsin is a helpful starting point. Termination of parental rights proceedings involve a two-step process that begins when the petitioner pleads one of the ten grounds for involuntary termination under Wis. Stat. § 48.415. The first step of the proceeding is the fact-finding hearing. "The purpose of the fact-finding hearing is to determine whether grounds exist for the termination of parental rights in those cases where the termination [is] contested . . . ." Wis. Stat. § 48.424(1). "If the jury or court determines that the facts alleged in the petition have not been proven, the court dismisses the petition. Conversely, '[i]f grounds for the termination of parental rights are

found by the court or jury, the court shall find the parent unfit.' " *Sheboygan Cnty. Dep't of Health & Human Servs. v. Julie A.B.*, 2002 WI 95 ¶ 26, 255 Wis. 2d 170, 648 N.W.2d 402 (citing § 48.424(4)). The focus of this step is whether the § 48.415 ground has been met, not the child's best interest.

¶ 19. The second-step, the dispositional hearing, occurs only after the fact-finder finds a Wis. Stat. § 48.415 ground has been proved and the court has made a finding of unfitness. *Id.*, ¶ 28. In this step, the best interest of the child is the "prevailing factor." *Id. See also,* Wis. Stat. § 48.426(2). If the court finds a termination of parental rights is in the child's best interest, termination should be ordered. *Julie A.B.*, 255 Wis. 2d 170, ¶ 38.

b. Statutory interpretation

¶ 20. "[S]tatutory interpretation begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58 ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotation and citation omitted). Moreover, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole . . . and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. "Where statutory language is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history." *Id.*

¶ 21. This case requires us to interpret subsec. (6) of Wis. Stat. § 48.415, "Grounds for involuntary termination of parental rights." Subsection (6) provides:

Failure to assume parental responsibility. (a) Failure to assume parental responsibility, which shall be

established by proving that the parent or the person or persons who may be the parent of the child *have not had* a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of *significant responsibility* for the *daily* supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person *has* expressed concern for or interest in the support, care or well-being of the child, whether the person *has* neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person *has* expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

(emphasis added).

■

¶ 22. The language of Wis. Stat. § 48.415(6), specifically the underscored language, indicates that under § 48.415(6), a fact-finder must look to the totality-of-the-circumstances to determine if a parent has assumed parental responsibility. With regard to the relevant time period, the fact-finder should consider the circumstances that have occurred over the entirety of the child's life.[7] The fact-finder may also consider whether a parent exposed her child to a hazardous living environment.

---

[7] Per Wis. Stat. § 48.415(6), the fact-finder should consider whether a father expressed concern and support for the mother during pregnancy and therefore, the relevant time period should include the time the child was in utero. Hereinafter, we will refer to the child's time in utero and after birth, collectively, as the "child's life." This is for the ease of reading.

## 1. Relevant time period

¶ 23. The first certified question is whether "once a 'substantial parental relationship' is established, the relevant time period ends and subsequent events are not relevant to the issue of a substantial parental relationship." *Tammy W-G.,* No. 2009AP2973, at 5. We conclude that a fact-finder should consider a parent's actions throughout the entirety of the child's life when determining whether he has assumed parental responsibility.

¶ 24. Looking first to para. (a) of the statute, the language, "have not had," does not direct the fact-finder to consider only a limited time period. For example, it does not say "have not had for at least several months." Rather, the statute gives latitude to the fact-finder to consider the entirety of the child's life and determine if the parent's actions have been sufficient to find that he has assumed parental responsibility.

¶ 25. The accuracy of this interpretation is supported by para. (b) of Wis. Stat. § 48.415(6). In defining "substantial parental relationship," para. (b) speaks of "*significant* responsibility for the *daily* supervision, education, protection and care of the child." (Emphasis added.) The words "significant" and "daily" do not indicate that the assumption of parental responsibility is established when the parent has cared for the child for only a short portion of the child's life.

■
¶ 26. Paragraph (b) goes on to explain that in deciding whether there is a "substantial parental relationship," the fact-finder may consider, among other things, whether the parent "has expressed concern for or interest in the support, care or well-being of the child," and whether the parent "has neglected or refused

to provide care or support for the child." Similar to the "has not had" language discussed above, the use of "has" in Wis. Stat. § 48.415(6)(b) demonstrates that the legislature did not intend the fact-finder to consider a specific point in time. Again, the legislature did not say "has at one point" or "has for several months." Rather, the fact-finder can consider all the facts up until the time of the fact-finding hearing to decide if the parent *has* engaged in the requisite behavior.

¶ 27. While we employ a plain language meaning to interpret Wis. Stat. § 48.415(6), we note that the legislative history of § 48.415(6) supports a totality-of-the-circumstances test. Subsequent to the enactment of § 48.415(6) in 1979,[8] there have been efforts to change the language in § 48.415(6) that concern the relevant

---

[8] When Wis. Stat. § 48.415(6) was first enacted, it read:

Failure to assume parental responsibility. (a) Failure to assume parental responsibility may be established by a showing that a child has been born out of wedlock, not subsequently legitimated or adopted, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and:

1. The person or persons who may be the father of the child have been given notice under s. 48.42 but have failed to appear or otherwise submit to the jurisdiction of the court and that such person or persons *have never had* a substantial parental relationship with the child; or

2. That although paternity to the child has been adjudicated under s. 48.423, the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity although the father had reason to believe that he was the father of the child and had an opportunity to establish a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person *has ever* ex-

289

time period. In 1995, an amendment was proposed to "[s]pecify the pertinent time period during which the parent must have failed to assume parental responsibility, for example, in the year prior to the time the [termination of parental rights] petition was filed." *State v. Bobby G.*, 2007 WI 77, ¶ 84, 301 Wis. 2d 531, 734 N.W.2d 81 (quoting the Note of the Joint Legislative Council's Special Committee that drafted amendments to § 48.415(6)(a), 1995 Wis. Act. 275). There was a handwritten "No" next to the recommendation. *Id.* This proposal shows the legislature considered whether to narrow the fact-finder's analysis to a specific time period. The rejection of this change shows the legislature refused to require a fact-finder to consider a specified time period (e.g., the time of the fact-finding hearing or, similarly, the first four months of the child's life as in Jacob's case). Instead, the legislature kept the relevant time period broad, allowing the fact-finder to consider the child's entire life and decide if, based on all the facts, a parent has assumed parental responsibility for his or her child.

¶ 28. The statutory history of Wis. Stat. § 48.415(6) also supports a totality-of-the-circumstances analysis. In 2005, the legislature changed the language in what was formerly para. (6)(a) so that a fact-finder no longer had to find that parents *"have never had* a substantial parental relationship," but rather it must find they *"have not had* a substantial parental relationship." (Emphasis added.) The amendments also eliminated the word "ever" in para. (b). *Id.*, ¶ 87 n.38.

pressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy and whether the person has neglected or refused to provide care or support even though the person had the opportunity and ability to do so.

(Emphasis added.)

¶ 29. According to the Special Committee on Adoption and Termination of Parental Rights Law, this change was recommended because "requiring a showing that the person has *never* had a substantial relationship with the child can be difficult if the parent ever showed any interest or had any contact with the child."[9] In a memorandum to the committee, Milwaukee County Circuit Court Judge Christopher Foley recommended the change. Based on his experience,

> [t]he use of the term "never" in this statute is troublesome and dramatically misleading. The fact that a parent may have been June Cleaver or Doctor [Huxtable] for a week or even a month of a child's two-year existence should not defeat a claim made under the statute. The relationship is not substantial because it is so insignificant in length. Yet we hear over and over again defense lawyers arguing: "never means never". The term is misleading and unnecessary.[10]

¶ 30. The elimination of the words "never" and "ever" from the statute afford the fact-finder flexibility with regard to the time period it may consider. Therefore, the elimination of words supports our conclusion that the statute does not direct a fact-finder to a limited time period.

¶ 31. In addition, examining the entirety of a child's life is the logical interpretation given the diverse fact situations that fall under Wis. Stat. § 48.415(6). For example, if, as counsel for Jacob argued in oral arguments, 100 days is the threshold time period that will

---

[9] Wis. Legis. Council, Rep. to the Leg.: Special Committee on Adoption and Termination of Parental Rights Law, at 11 (July 25, 2005).

[10] Chris Foley, Mem. re: Declarations of Parental Interest; Abandonment and Failure to Assume Parental Responsibility, Sept. 22, 2004.

always be enough to prove one had assumed parental responsibility, this could lead to absurd results. Under that interpretation, the parent of a six-month-old child who cared for the child 90 of the first 180 days, i.e., 50%, of the child's life would be at risk of a termination of parental rights for failure to assume parental responsibility. Contrarily, the parent of a 16–year-old, who cared for the child the first 110 days, i.e., roughly 1.9%, of the child's life, but had no parental involvement after that, would be immune from a determination that the parent "failed to assume parental responsibility." It would be absurd to provide the latter parent more protections under the statute than the former.

¶ 32. Consistent with our past decisions, under a totality-of-the-circumstances analysis, the fact-finder can and should consider the reasons why a parent has not supported or cared for her child. *See L.K. v. B.B. (Baby Girl K.),* 113 Wis. 2d 429, 442, 335 N.W.2d 846 (1983) ("A court cannot ignore the circumstances of why this father was not physically available from the fifth month of pregnancy. He was convicted and sentenced for burglary. This was not a case of being absent because of illness, military service or the demands of a job. His absence was due to incarceration from the wilful act of burglary."). *Ann M.M. v. Rob S.,* 176 Wis. 2d 673, 685, 500 N.W.2d 649 (1993) ("[W]e cannot ignore the fact that any roadblock to establishing a relationship with SueAnn caused by [the father's] arrest, bond, and conviction was produced by [the father's] own conduct.").[11]

---

[11] Contrary to Jacob's assertion, our decision does not defeat the rights of parents whose military service or illness prevents them from caring for their children for extended periods of time.

¶ 33. Jacob argues that under the plain language of Wis. Stat. § 48.415(6), if a parent cares for his child for a distinct and relatively short period of time, he must be found to have "assumed parental responsibility." Jacob contends that "assume" is an active verb, which means to "take up or in" and does not require a parent to "assume and maintain" a "substantial parental relationship." Jacob's argument is misplaced for at least three reasons. First, if all that was meant by "assume" was that at one time the parent took on some parental responsibility, a single day or week of responsibility would be sufficient. While a parent can "take up" parental responsibility for one day, the statute cannot easily be read to protect the rights of a parent who cared for and supported his child for this limited time period.

¶ 34. Second, Jacob's interpretation ignores the definition of "substantial parental relationship" in Wis. Stat. § 48.415(6)(b) that calls for "*significant* responsibility" for "*daily* supervision, education, protection and care of the child." (Emphasis added.) Third, Jacob's interpretation ignores the statutory and legislative history discussed above. That history demonstrates that the legislature considered limiting the fact-finder in ways that would prevent it from finding a parent failed to assume parental responsibility if the parent was involved with the child for only a small portion of the child's life. The legislature rejected such a limitation.

¶ 35. Jacob also points to the phrase "have not had" in para. (a). He argues that because the phrase is in the past-tense, not the present tense equivalent, "do not have," the statute does not mean a parent must "assume and maintain" a "substantial parental relationship." This, however, does not advance Jacob's case. The fact-finder still is permitted to look at the child's life as a whole, and to decide whether, given all the facts, there has been an assumption of parental responsibility.

## 2. Hazardous living environment

¶ 36. The second certified question is "whether a fact-finder may determine that, despite significant parenting, poor quality parenting is a reason to find that a 'substantial parental relationship' [as defined in Wis. Stat. § 48.415(6)] has not been established." *Tammy W-G.,* No. 2009AP2973, at 5. The certification of this question comes from the court of appeals decision in *Quinsanna D.,* which held that it would have been acceptable for the jury to conclude that Quinsanna did not exercise significant responsibility for the twins because her " 'daily supervision' of [the twins] included her daily exposure of them to her own drug use and drug house." *Quinsanna D.,* 259 Wis. 2d 429, ¶ 32.[12] Because the court in *Quinsanna* actually was deciding whether it was acceptable for the fact-finder to consider Quinsanna's exposure of her twins to a hazardous living environment, we interpret the second certified question to be whether the fact-finder may consider whether a parent exposed her child to a hazardous living environment, as opposed to the consideration of the amorphous term, "quality of parenting."

¶ 37. We conclude that under the totality-of-the-circumstances test, a fact-finder may consider whether, during the time the parent was caring for his child, he exposed the child to a hazardous living environment. Supervision, protection and care of a child, by definition, involve keeping that child out of harm's way.

---

[12] In *Quinsanna D.,* the State removed Quinsanna's two-year-old twins from her care when Quinsanna was arrested following a police raid of her residence that she was using as a drug house. *State v. Quinsanna D.,* 2002 WI App 318, ¶¶ 4-5, 259 Wis. 2d 429, 655 N.W.2d 752. Quinsanna was convicted of various drug charges as a result of the raid. *Id.,* ¶ 5.

¶ 38. In sum, when applying Wis. Stat. § 48.415(6), the fact-finder should consider the involvement of the parent over the entirety of the child's life. The plain language and legislative history of § 48.415(6) support this interpretation, an interpretation that will avoid absurd results. Moreover, although a parent's lack of opportunity to establish a substantial relationship is not a defense to failure to assume parental responsibility, the reasons for a parent's lack of involvement still may be considered in the totality-of-the-circumstances analysis. The fact-finder may also consider whether the parent, while caring for the child, exposed the child to a hazardous living environment.[13]

### c. Application

¶ 39. The jury was asked, "Has Jacob [] failed to assume parental responsibility for Gwenevere []?" The jury found that he failed to do so.[14] When reviewing a

---

[13] Jacob argues that this interpretation of Wis. Stat. § 48.415(6) renders other grounds for termination, specifically § 48.415(1), "Abandonment," and § 48.415(2), "Continuing need of protection or services," superfluous. However, both those grounds require a fact-finder to consider different factors than § 48.415(6). For example, under § 48.415(1), there are grounds for termination if a parent leaves a child without provisions for care and support, and the petitioner is unable to find either parent of the child for 60 days. Under § 48.415(2), the grounds for termination are based largely on the child's placement outside the home. Consequently, while there may be fact situations where there would be grounds for terminations under numerous subsections, there could also be fact patterns where § 48.415(1) and (2) would provide grounds for the termination of parental rights when § 48.415(6) does not. Therefore, our interpretation of § 48.415(6) does not render other subsections superfluous.

[14] Chief Justice Abrahamson in her dissent attempts to

jury's verdict, we consider the evidence in the light most favorable to the verdict. *Poellinger,* 153 Wis. 2d at 501. Here, we conclude that there was sufficient evidence to support the jury's verdict.

¶ 40. In the four-and-a-half years of Gwenevere's life leading up to the fact-finding hearing, Jacob had actual custody of Gwenevere for only the first four months. He never had legal custody of her. Moreover, after month four, he provided Gwenevere no financial or material support. Consequently, Jacob supported Gwenevere, with regard to both care and finances, for only a small portion of her life.

¶ 41. In addition, Jacob's contact with Gwenevere after his move to Illinois in May 2005 does not demonstrate that he had a "substantial parental relationship" with Gwenevere. Since she was approximately five months old, Jacob has had in-person contact with Gwenevere, at most, three times, and each visit was of short duration. Moreover, Jacob's calls to Tammy and Gwenevere were infrequent, and a jury could easily have found that there were extremely long periods of time, even a year's length, when Jacob did not contact Gwenevere. Finally, there was no evidence Jacob sent Gwenevere cards, birthday or holiday gifts, however small, or had any other contact with her besides the few short visits and infrequent phone calls. This is far from "daily" care.

---

re-characterize the jury's factual finding into an assumption of the judicial task of determining whether Jacob had a protected liberty interest in his parentage of Gwenevere. Chief Justice Abrahamson's dissent, ¶¶ 74–88. In so doing, she ignores the majority's establishment of the standard of review we apply to Jacob's constitutional claims, *see* ¶ 16 supra, as well as our independent review of Jacob's claimed liberty interest, *see* ¶¶ 69–70 infra.

¶ 42. The reasons Jacob presented for why he had such little contact with his daughter—Tammy's supervised visit requirements—do not support Jacob's case. While we acknowledge these requirements may have been frustrating for Jacob, they do not excuse him from his parental responsibilities to Gwenevere. Neither Jacob nor Tammy claimed at trial that Tammy would not let Gwenevere visit with Jacob, in fact the evidence suggested the opposite. Tammy's efforts to constantly apprise Jacob of her whereabouts suggest she wanted Jacob and Gwenevere to have contact with one another. This is not a case where Jacob, because of financial or other disabilities, was unable to travel to see Gwenevere, especially when she lived only a few hours' drive away. Moreover, Jacob's situation is drastically different from a military father or a parent with a profession that requires them to be away for long periods of time. Instead, Jacob neglected his daughter, perhaps in part because he was unable to accept the conditions her mother, and legal guardian, placed on his visitations. Jacob never sought court assistance in establishing a relationship with Gwenevere, and even if the fact-finder believed Jacob's assertion that he was saving to hire a lawyer to challenge Tammy's visitation conditions, Jacob does not get a "free pass" on his parental responsibilities.

¶ 43. Of note, while we conclude that a fact-finder may consider the exposure of a child to hazardous environments under the totality-of-the-circumstances test, the jury could not have relied on a hazardous environment in this case, as there was none. Jacob's messy housekeeping, drinking alcohol and smoking marijuana were not shown to be sufficient to create a hazardous environment for a four-month-old child, and there was no evidence presented of Jacob's habits subsequent to his move to Illinois in 2005.

¶ 44. To summarize, the facts support the jury's finding that Jacob did not meet the requirements of Wis. Stat. § 48.415(6): he did not "accept[] and exercise" "significant responsibility for the daily supervision, education, protection and care" of Gwenevere, and/or he "neglected or refused to provide care or support for" Gwenevere. Consequently, we conclude that the jury verdict should not be disturbed.

## C. Constitutionality

¶ 45. The third certified issue is whether the application of Wis. Stat. § 48.415(6), "comports with the constitutional protections afforded parents." *Tammy W-G.*, No. 2009AP2973, at 11. This question turns on whether Jacob has a constitutionally protected interest in his parentage, i.e., a fundamental liberty interest in his relationship with Gwenevere.[15] *Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 20, 270 Wis. 2d 384, 677 N.W.2d 630.

### a. Constitutional challenges

¶ 46. The two major types of constitutional challenges are "facial" and "as-applied." *State v. Joseph E.G.*, 2001 WI App 29, ¶ 5, 240 Wis. 2d 481, 623 N.W.2d 137. Statutes are generally presumed constitutional. *Id.* "Because a facial constitutional challenge attacks the

---

[15] Jacob argues that Wis. Stat. § 48.415(6) as applied to him does not meet strict scrutiny because he was not allowed to prove he is not unfit by showing that there was good cause for his lack of contact with Gwenevere. Moreover, he argues that he should have been given an opportunity, with the help of reasonable services from the State, to regain custody of Gwenevere.

law itself as drafted by the legislature, claiming the law is void from its beginning to [] end and that it cannot be constitutionally enforced under any circumstances, the presumption of constitutionality is proper." *Society Ins. v. LIRC,* 2010 WI 68, ¶ 26, 326 Wis. 2d 444, 786 N.W.2d 385. "This presumption is based on our respect for a co-equal branch of government and is meant to promote due deference to legislative acts." *Ponn P.,* 279 Wis. 2d 169, ¶ 16. In a facial challenge, the challenger must persuade us that the "heavy burden" to overcome the presumption of constitutionality has been met, and that there is proof beyond a reasonable doubt that the statute is unconstitutional. *Id.,* ¶ 18.

¶ 47. However, we interpret Jacob's challenge to Wis. Stat. § 48.415(6) as a claim that § 48.415(6) is unconstitutional as applied to him. In an as-applied challenge, the constitutionality of the statute itself is not attacked; accordingly, the presumption that the statute is constitutional applies, just as it does in a facial challenge. *State v. Wood,* 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63 (concluding that Wood, who mounted both a facial and an as-applied constitutional challenge, "must prove that the challenged statute is unconstitutional beyond a reasonable doubt. . . . [and t]hat presumption [that the statute is constitutional] and burden [of persuasion] apply to facial as well as to as-applied constitutional challenges"); *State v. Smith,* 2010 WI 16, ¶ 8, 323 Wis. 2d 377, 780 N.W.2d 90 (concluding that in a challenge based on an allegedly unconstitutional application of Wis. Stat. § 301.45 the "statute enjoys a presumption of constitutionality").

¶ 48. However, in as-applied challenges, "[w]hile we presume a statute is constitutional, we do not

presume that the State applies statutes in a constitutional manner." *Society Ins.,* 326 Wis. 2d 444, ¶ 27. Therefore, in an as-applied challenge, neither party faces a presumption that the statute was constitutionally applied.[16] *Id.*

¶ 49. To explain further, the analysis that is employed for an as-applied challenge contains no presumption in regard to whether the statute was applied in a constitutionally sufficient manner. Rather, the analysis of an as-applied challenge is determined by the constitutional right that is alleged to have been affected by the application of the statute. Stated otherwise, the analysis differs from case to case, depending on the constitutional right at issue.

¶ 50. For example, in *State v. Miller,* 202 Wis. 2d 56, 549 N.W.2d 235 (1996), we considered whether Wis. Stat. § 347.245(1), which required displaying a red and orange triangular emblem on slow-moving vehicles, was an unconstitutional burdening of the religious beliefs of Miller and others who were members of the Old Order Amish faith. *Id.* at 59. Miller had been

---

[16] The certified question, independent of Jacob's contentions, could be interpreted to mount a facial challenge to Wis. Stat. § 48.415(6). However, when there is at least one interpretation and application of a statute that is constitutional, that statute is constitutional on its face. *See Dane Cnty. Dep't of Human Servs. v. Ponn P.,* 2005 WI 32, ¶ 33, 279 Wis. 2d 169, 694 N.W.2d 344. Because, as discussed below, we conclude the § 48.415(6) is constitutional as applied to Jacob, it is therefore facially constitutional. Even more, "a 'facial challenge should generally not be entertained when an 'as-applied' challenge could resolve the case.' " *Society Ins. v. LIRC,* 2010 WI 68, ¶ 27 n.8, 326 Wis. 2d 444, 786 N.W.2d 385 (citing *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 624 (1996)).

ticketed for refusing to display the required emblem, based on his religious convictions. *Id.* at 60. Because the challenge to the application of the statute involved an issue of freedom of conscience based on Miller's religious convictions, we applied the "compelling state interest/least restrictive alternative test" in determining whether § 347.245(1) violated the Wisconsin Constitution when applied to Miller and others. *Id.* at 66. We concluded that § 347.245(1) was "unconstitutional as applied to the eight Amish defendants because the State failed to prove that the [slow-moving vehicle] symbol was the least restrictive alternative available that would satisfy the State's interest in traffic safety." *Id.* at 59. Our analysis of the as-applied challenge to § 347.245(1) did not include a presumption that the statute had been constitutionally applied.

¶ 51. In *State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785, we considered whether Wisconsin's concealed carry statute, Wis. Stat. § 941.23 (1999–2000), was applied in violation of Hamdan's rights under Article I, Section 25 of the Wisconsin Constitution.[17] We concluded that "courts may limit the broad application of the [concealed carry] statute in those circumstances where limitation is necessary to narrowly accommodate the constitutional right to keep and bear arms for lawful purposes." *Id.,* ¶ 39. The test we set out was "whether the State may restrict the carrying of a concealed firearm in these circumstances without unreasonably infringing Hamdan's rights under Article I, Section 25." *Id.,* ¶ 43. In this test of reasonableness, we balanced the "rights of an individual

---

[17] In *State v. Cole,* 2003 WI 112, ¶¶ 12–18, 264 Wis. 2d 520, 665 N.W.2d 328, decided the same day as *State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785, we concluded that a facial challenge to Wis. Stat. § 941.23 did not lie.

to keep and bear arms for lawful purposes against the authority of the State to exercise its police power to protect the health, safety, and welfare of its citizens." *Id.*, ¶ 45. No presumption that the statute was constitutionally applied entered into our discussion. Rather, we examined the facts that bore on the interests that were to be balanced.

### b. Substantive due process

¶ 52. Parents who have developed a relationship with their children have a fundamental liberty interest in the "care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 57 (2000). The Supreme Court has emphasized the magnitude of parents' rights:

> The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and [r]ights far more precious . . . than property rights. It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.

*Stanley v. Illinois,* 405 U.S. 645, 651 (1972) (internal citations and quotations omitted). When a fundamental liberty interest is found, "any statute that impinges on that right must withstand strict scrutiny." *Ponn P.,* 279 Wis. 2d 169, ¶ 20. Strict scrutiny requires a showing that the statute, as applied, is narrowly tailored to advance a compelling state interest. *Monroe Cnty. Dep't of Human Servs. v. Kelli B.,* 2004 WI 17, ¶ 17, 271 Wis. 2d 51, 678 N.W.2d 831.

¶ 53. If there is no fundamental interest, the statute's application must withstand only a rational basis review. *Id.* Rational basis is satisfied if the application of the statute bears a rational relation to a legitimate legislative objective. *Id.* Accordingly, one of our tasks is to identify the precise nature of Jacob's parental relationship with Gwenevere.

¶ 54. In *Stanley,* the Court held that an unwed father who had "sired and raised" his children was entitled to a hearing on unfitness before his children could be taken from his care.[18] *Stanley,* 405 U.S. at 650–51. That father had lived intermittently for 18 years with the mother of his children and participated actively in the children's upbringing. *Id.* at 646.

¶ 55. Several years later, the Court examined the rights of a father, Quilloin, who was less involved in the life of his child. In *Quilloin v. Walcott,* 434 U.S. 246 (1978), the mother sought termination of Quilloin's parental rights to their 11–year-old son so he could be adopted by his step-father. *Id.* at 247. The mother and Quilloin were never married and had never resided together. *Id.* Moreover, Quilloin never petitioned for legitimization of his son. *Id.* at 249. While the child always had been in the care and custody of his mother, his father "provided support only on an irregular basis," visited with him on "many occasions" and gave him toys and gifts "from time to time." *Id.* at 251. Nevertheless, the Georgia trial court terminated the father's rights and granted the adoption. *Id.* at 247. A finding of unfitness was never made. *Id.* On review, the Court

[18] *Stanley* involved a challenge to an Illinois law that made children of unwed mothers wards of the state upon the death of their mother. *Stanley v. Illinois,* 405 U.S. 645, 646 (1972).

found that Quilloin's due process rights were not violated. *Id.* at 255. The Court pointed out that Quilloin "has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child."[19] *Id.* at 256.

¶ 56. A year later in *Caban v. Mohammed,* 441 U.S. 380 (1979), the Court held that the natural father, Caban, had manifested a significant parental interest for his two children so that their adoption by their step-father could not be granted without Caban's permission.[20] Caban and the children's mother resided together for more than five years, during which time the children were born. *Id.* at 382. Caban lived with the children until they were two and four years-old and contributed to their support during this time. *Id.* After the couple separated, Caban continued to have contact with the children. He visited with them each week until their maternal grandmother took them to Puerto Rico. *Id.* Despite their geographical distance, "Caban communicated with the children through his parents, who also resided in Puerto Rico." *Id.* at 383. Given these facts, the Court concluded that Caban had "established a substantial relationship" with the children and was therefore entitled to heightened procedural protections. *Id.* at 391, 393.

---

[19] This language is extremely similar to the language of Wis. Stat. § 48.415(6). Because of this similarity and because § 48.415(6) was passed a year after *Quilloin* was decided, the Wisconsin legislature may have considered *Quilloin* when it enacted § 48.415(6).

[20] The New York Statute in *Caban* required the permission of an unmarried mother before her children could be adopted, but not the permission of the unmarried father. *Caban v. Mohammed,* 441 U.S. 380, 386–87 (1979).

304

¶ 57. The Court synthesized the holdings in *Stanley, Quilloin* and *Caban* in *Lehr v. Robertson,* 463 U.S. 248 (1983). In *Lehr,* the father, Lehr, lived with the mother prior to his daughter's birth and visited the hospital when she was born. Nevertheless, he did not live with them after his daughter's birth and never provided his daughter any financial support. *Id.* at 252. Lehr challenged, on due process grounds, the adoption of his daughter by her step-father, which adoption was granted without notice to or the permission of Lehr. *Id.* at 250.

¶ 58. The Court stated that Justice Stewart was correct in his dissent in *Caban* when he observed that,

"Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, it by no means follows that each unwed parent has any such right. *Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*"

*Id.* at 260 (quoting *Caban,* 441 U.S. at 397 (J. Stewart, dissenting)) (internal citation omitted). The Court went on:

The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban,* and the potential relationship involved in *Quilloin* and this case, is both clear and significant. When an unwed father demonstrates a *full commitment* to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. . . . The importance of the familial relationship, to the individuals involved and to the society, stems from the *emotional attachments that derive from the intimacy of daily association,*

305

and from the role it plays in promoting a way of life through the instruction of children . . . as well as from the fact of blood relationship.

*Id.* at 261 (emphasis added) (internal quotations and citations omitted). The Court specified when a father's constitutional rights attach:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his off-spring. If he *grasps that opportunity and accepts some measure of responsibility for the child's future,* he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* at 262 (emphasis added).

¶ 59. The Court concluded that Lehr had "never had any significant custodial, personal, or financial relationship with [his daughter], and he did not seek to establish a legal tie until after she was two years old." *Id.* Therefore, the New York notice proceedings were sufficient to protect Lehr's "inchoate" interests under the Due Process Clause. *Id.* at 265.

¶ 60. In sum, under Supreme Court jurisprudence, a liberty interest protected by the Due Process Clause arises only when biological parents have taken sufficient steps to establish and protect those rights.

¶ 61. Similarly, we have acknowledged that when a parent has not taken advantage of the opportunity to develop a relationship with his offspring and accept responsibility for the child's future, no liberty interest protected by substantive due process arises. *Randy A.J.,* 270 Wis. 2d 384, ¶ 20.

¶ 62. Whether a parent has shouldered her parental responsibilities was addressed in *Mrs. R. v. Mr. and Mrs. B. (J.L.W.),* 102 Wis. 2d 118, 306 N.W.2d 46 (1981). In that case, prior to the child, J.L.W.'s, birth, the mother, Mrs. R., asked her sister and her brother-in-law, Mr. and Mrs. B., to adopt her illegitimate child. *Id.* at 122–23. J.L.W. lived with Mrs. R. during most of the first four months of his life. *Id.* at 124–25. Mrs. R. then asked Mrs. B. to take J.L.W. because Mrs. R. was struggling to make ends meet as a single mother. *Id.* at 125. J.L.W. lived with his aunt and uncle until he was one-and-a-half when they petitioned for a termination of Mrs. R.'s parental rights and a guardianship appointment. Throughout this year and a half, J.L.W.'s mother kept in contact with J.L.W. She traveled to Milwaukee from her home in Boston for visits, she wrote letters, and she called. *Id.* at 126–30.

¶ 63. In *J.L.W.,* we disagreed with Mr. and Mrs. B.'s argument that Mrs. R. was like the father in *Quilloin* who had no fundamental right to "family integrity." *Id.* at 134. We first distinguished *Quilloin* because the "existing 'family unit' " in *Quilloin* involved the child's natural mother. *Id.* at 135. We went on to hold that unless there were circumstances comparable to those presented in *Quilloin* where the father had no constitutionally protected liberty interest, due process prohibits the "termination of a natural parent's rights, unless the parent is unfit." *Id.* at 136. In *J.L.W.,* the facts supported Mrs. R.'s claim that she had a fundamental liberty interest in her parental relationship with her son and therefore, we concluded that the termination of her parental rights was improper without first making a finding that Mrs. R. was unfit. *Id.* at 137.

¶ 64. In *Baby Girl K.,* 113 Wis. 2d 429, we distinguished *J.L.W.:*

Although in *J.L.W.,* this court suggested that due process might require a finding of unfitness before any natural parent's parental rights are terminated, the specific holding related only to a parent who had physical custody of the child for the first four months of the child's life and whose every action "from the time she learned of her pregnancy showed a concern for the child she was to bear." Unlike *Lehr, J.L.W.* was a case where the parent had already "*demonstrated a full commitment* to the responsibilities of parenthood."

*Id.* at 446 (quoting *J.L.W.,* 102 Wis. 2d at 137, *Lehr,* 463 U.S. at 261) (emphasis added). We went on to say,

A natural father's interest in personal contact with his child is protected under the due process clause because of this society's belief in the protection of the familial relationship. The significance of this relationship "to the individuals involved and to [the] society, stems from the emotional attachments that derive from the intimacy of *daily association,* and from the role it plays in promoting a way of life through the instruction of children as well as from the fact of blood relationship."

*Id.* at 447 (quoting *Smith v. Org. of Foster Families for Equality & Reform,* 431 U.S. 816, 844 (1977) (emphasis added).

¶ 65. In *Baby Girl K.,* Wis. Stat. § 48.415(6) was at issue. We held that Baby Girl K.'s father had not established a substantial relationship with her and therefore, a finding of unfitness was not required before his parental rights were terminated. *Id.* at 447–48. Baby Girl K.'s father was incarcerated when she was born. We explained that although the father could have established a relationship with his daughter by writing, calling or asking to see her, he chose instead to have no contact with her and the contact he had with the child's mother was harmful. *Id.* at 447.

¶ 66. We also have examined whether a substantial relationship has been established in several other cases. In *Ann M.M.*, we concluded that the child's father did not have a protected liberty interest. *Ann M.M.,* 176 Wis. 2d at 685–86. We held that although the father was incarcerated, he had the opportunity to develop a relationship with his child. *Id.* at 684. We concluded that nothing prevented the father from financially supporting the child, yet he refused to do so. *Id.* at 685. Moreover, he made no attempts to have contact with his daughter and, in fact, had never seen her. *Id.* at 685, 682. Finally, any roadblocks that contributed to his lack of contact were the product of his own wrongdoing. *Id.* at 685.

¶ 67. Next in *Kelli B.*, we held that the natural mother had a protected liberty interest. In that case, the mother, Kelli, had lived with and had custody of her three children until they were three, two, and seven-months-old.[21] *Kelli B.,* 271 Wis. 2d 51, ¶ 20. We held that Kelli established a fundamental liberty interest in parenting the children based on the amount of time she lived with and had custody of her children. *Id.*, ¶ 24. As such, it was a violation of due process to terminate Kelli's parental rights without a finding that she was unfit. *Id.*, ¶ 26.

¶ 68. Finally, in *Kenosha Cnty. Dep't of Human Servs. v. Jodie W.*, 2006 WI 93, 293 Wis. 2d 530, 716 N.W.2d 845, we held that the mother, Jodie, had a fundamental liberty interest in parenting her son, Max. Jodie cared for Max for the first two years of his life. However, when he was two-years-old, Jodie faced criminal convictions unrelated to her care of Max and was

---

[21] The children were approximately five, four, and two when the State filed the petition to terminate Kelli's rights.

incarcerated for four years. *Id.*, ¶ 4. The State petitioned for termination of Jodie's rights when Max was four. *Id.*, ¶ 8. We held that Jodie had a protected liberty interest in parenting Max. *Id.*, ¶ 41. We did not engage, however, in much factual discussion of why she had this interest, but assumedly it was based on the fact that she had care and custody for Max for the first two years of his life.

¶ 69. Based on both the Supreme Court precedent and our own precedent, we conclude that Wis. Stat. § 48.415(6) was constitutionally applied to Jacob. The fact-finder determined that Jacob failed to assume parental responsibility for Gwenevere. Jacob did not assume, or take steps to assume, emotional or financial responsibility for Gwenevere. He provided insufficient evidence to show that he had a protected liberty interest in his parental relationship with her. *Quilloin,* 434 U.S. at 256; *Randy A.J.,* 270 Wis. 2d 384, ¶ 20. Without a protected liberty interest, we consider whether, as applied to Jacob, the statute is rationally related to a legitimate legislative interest. *Kelli B.,* 271 Wis. 2d 51, ¶ 17.

¶ 70. There is a legitimate legislative interest in keeping an existing family unit intact. We note that one of the legislative purposes of the Children's Code is "to preserve the unity of the family." Wis. Stat. § 48.01(1). Gwenevere has been living in a family unit with Tammy, Douglas, and her half sisters for most of her life.[22] By terminating Jacob's rights, Douglas will be

---

[22] Unlike the facts of *J.L.W.*, the existing family unit includes Gwenevere's biological mother and two biological half-sisters.

able to adopt Gwenevere, therefore recognizing the existing family unit and the only family unit that Gwenevere knows. There is also a legitimate legislative interest in providing stability for the child. § 48.01(1). Stability may be provided through the daily care and protection given to a child. Jacob has had almost no contact with and has provided no support to Gwenevere for almost four years. In contrast, Gwenevere's mother and step-father have provided her with a stable place to grow. It is they who have promoted the legislative interest in stability for the child. Accordingly, we conclude that Wis. Stat § 48.415(6) was constitutionally applied to Jacob because its application to Jacob is rationally related to legitimate legislative interests.

### D. Directed Verdict

¶ 71. In reviewing the denial of a motion for a directed verdict, we assess whether the record contains sufficient credible evidence, including the inferences therefrom, to sustain a finding in plaintiff's favor. *James v. Heintz,* 165 Wis. 2d 572, 576–77, 478 N.W.2d 31 (Ct. App. 1991). Jacob's argument that the circuit court should have granted his motion for a directed verdict is driven by his argument that the fact-finder should have considered only the first four months of Gwenevere's life when deciding whether he "assumed parental responsibility." Because, as discussed above, the fact-finder is to consider the entirety of the child's life and to apply a totality-of-the-circumstances analysis, the circuit court did not err in denying Jacob's motion.

### E. Jury Instructions

¶ 72. Jacob argues that the jury instructions were improper because they did not specify that the jury

311

should focus on a specific time period when determining if Jacob assumed parental responsibility for Gwenevere. Jacob, however, waived this argument when he did not object to the jury instructions at trial and therefore, we choose not to exercise our discretionary power of review over whether the jury instructions were correct. *State v. Schumacher,* 144 Wis. 2d 388, 410, 424 N.W.2d 672 (1988). Furthermore, the totality-of-the-circumstances analysis, which is applicable to a determination of whether grounds for termination of parental rights under Wis. Stat. § 48.415(6) has been proved, includes consideration of the child's entire life. See ¶¶ 31–32 above.

### III. CONCLUSION

¶ 73. We conclude that Wis. Stat. § 48.415(6) prescribes a totality-of-the-circumstances test. When applying this test, the fact-finder should consider any support or care, or lack thereof, the parent provided the child throughout the child's entire life. This analysis may include the reasons why a parent was not caring for or supporting her child and any exposure of the child to a hazardous living environment. We further conclude that the statute was not unconstitutional as applied to Jacob. Finally, the circuit court did not error when it denied Jacob's motion for a directed verdict and Jacob waived his argument that the jury instruction was improper. Accordingly, Jacob's parental rights were lawfully terminated; we affirm the judgment of the circuit court.

*By the Court.*—The decision of the circuit court is affirmed.

¶ 74. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I join Justice Ann Walsh Bradley's dissent. I write

312

separately to address a fundamental issue that the majority opinion assumes without analysis. The majority opinion assumes that whether a substantial parental relationship exists under Wis. Stat. § 48.415(6) is a question for the jury. Majority op., ¶¶ 22, 23, 24, 26, 32, 34, 35, 37, 38. I disagree. I conclude that the determination of whether a substantial parental relationship exists is a question of law for the court. It is a threshold constitutional issue that needs to be decided in a termination of parental rights case. I come to this conclusion on the basis of both the language of Wis. Stat. § 48.415(6), as well as the usual standard of review for deciding questions of constitutional law.

I

¶ 75. With regard to the statutory interpretation. The language of § 49.415(6) is explicit. The court, not the fact-finder, decides whether a parent has had a substantial parental relationship.

¶ 76. The introductory language of Wisconsin Stat. § 48.415 explicitly states that the *court or jury* determines whether grounds exist for termination of parental rights. The subsections then state the grounds.

¶ 77. Subsection (6), entitled "failure to assume parental responsibility," is at issue in the present case. Failure to assume parental responsibility is established by proving that the parent has not had a substantial parental relationship with the child. "Substantial parental relationship" is defined in § 48.415(6)(b). Moreover, in § 48.415(6)(b) the legislature has expressly stated that "*the court*" determines whether a substantial parental relationship with the child exists. The legislature directs "the court" to consider a non-exhaustive list of factors:

**48.415 Grounds for involuntary termination of parental rights.** At the fact-finding hearing *the court or jury* shall determine whether grounds exist for the termination of parental rights. . . . Grounds for termination of parental rights shall be one of the following:

. . . .

**(6) Failure to assume parental responsibility.**

(a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have not had a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, *the court* may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

(Emphasis added.)

¶ 78. The legislature's explicit declaration in Wis. Stat. § 48.415(6)(b) that "the court," not the jury, determines whether a parent has had a substantial parental relationship is strikingly apparent when the language of § 48.415(6) is compared to the general introductory language of § 48.415, in which the legislature states: "At the fact-finding hearing *the court or jury* shall determine whether grounds exist for the termination of parental rights" (emphasis added).

314

¶ 79. The majority opinion ignores the text of Wis. Stat. § 48.415. It ignores the introductory language and the language of Wis. Stat. § 48.415(6)(b). The majority opinion effectively adds language to § 48.415(6)(b), judicially amending § 48.415(6)(b) to read as follows: "In evaluating whether the person has had a substantial parental relationship with the child, *the court or the jury* may consider such factors . . . ."

¶ 80. The majority offers no explanation for deviating from the carefully crafted statute as promulgated by the legislature.

¶ 81. The importance of faithfully adhering to the statutory language becomes clearer when the statute is examined in light of the fundamental constitutional rights affected in a termination of parental rights proceeding.

## II

¶ 82. With regard to the standard of review to review a constitutional issue, I agree with Justice Bradley's analysis summing up the nature of the fundamental constitutional right at stake in termination of parental rights proceedings and the standard articulated by the United States Supreme Court in establishing the framework for a parent's constitutional right to parent. Justice Bradley's dissent, ¶¶ 98–106. I further agree with Justice Bradley that the apparent intent of the legislature in promulgating § 48.415(6) was to codify the standard set forth by the United States Supreme Court. Justice Bradley's dissent, ¶ 105.

¶ 83. Wisconsin Stat. § 48.415(6) differs from other subsections of § 48.415, as Justice Bradley explains. Justice Bradley's dissent, ¶ 106. Subsection (6) sets forth the threshold constitutional question to be

315

determined, namely whether a parent has a constitutionally protected liberty interest in his or her relationship with the child. Justice Bradley's dissent, ¶ 106. The other subsections are fitness determinations. *Id.*

¶ 84. If there is a constitutionally protected liberty interest, then the parent's rights are protected by due process. Due process requires that a parent's parental rights may be terminated only after a determination that the parent is unfit under the other grounds for termination of parental rights in § 48.415 (*see, e.g.,* abandonment, Wis. Stat. § 48.415(1)). If there is no protected liberty interest, then the standard for termination is the best interests of the child. Justice Bradley's dissent, ¶ 101 & n.2.

¶ 85. The question whether a parent has a substantial parental relationship requires the application of a constitutional standard to the facts.[1] The court has denominated questions presenting the application of a constitutional standard to the facts as presenting a question of constitutional fact. A constitutional fact is one which, though cast in the form of a determination of fact, is decisive of constitutional rights.[2]

¶ 86. In this case the significant historical facts are not in dispute.[3] Majority op., ¶¶ 4–13. Therefore,

---

[1] *Watts v. Indiana*, 338 U.S. 49, 51–52 (1949).

[2] *Watts v. Indiana*, 338 U.S. 49, 51 (1949); *State v. Hajicek*, 2001 WI 3, ¶¶ 14–15, 240 Wis. 2d 349, 620 N.W.2d 781; *State v. Martwick*, 2000 WI 5, ¶ 17, 231 Wis. 2d 801, 604 N.W.2d 552.

[3] In closing arguments, the mother's attorney acknowledged: "And those factors which we don't deny exist are that Jacob was supportive of Tammy during the pregnancy . . . . Jacob had provided care and supervision for the first five months of the child's life . . . ." Based on the testimony of the father and mother counsel also conceded that "through June of 2005, he had maybe met that burden" of assuming a substantial

the question that remains is the application of a constitutional standard to the facts, ordinarily a question of law.

¶ 87. Nevertheless, the circuit court concluded without analysis that this application of a constitutional standard to the undisputed facts was for the jury. In denying both parties' motions for a directed verdict, the circuit court concluded: "There are reasonable grounds which the jury may accept, to accept either argument of the parties, alternatively, depending upon the time period which they may choose to think is important more than another in determining substantial involvement of the father with his daughter."

¶ 88. In the present case, in which there are no disputed facts, the application of a constitutional standard to undisputed facts is a question of law for the court, first the circuit court and then an appellate court.

¶ 89. Furthermore, as a general rule, the application of a constitutional standard, here substantial parental relationship, to the facts, even if facts are disputed, is a question of law for the court, first the circuit court and then an appellate court.

¶ 90. An appellate court often applies a two-step standard of review to constitutional inquiries. An appellate court applies a deferential, clearly erroneous standard to the circuit court's findings of evidentiary or historical fact. An appellate court then determines the question of constitutional fact, here whether a person has had a substantial parental relationship, independently of the circuit court and court of appeals. The court has stated that applying a deferential standard of review to a circuit court's or jury's ultimate determina-

parental relationship "but once he left, there's four and a half years in which he's been absent."

tion of a constitutional fact would lead to "varied results" that "would be inconsistent with the idea of a unitary system of law."[4]

¶ 91. The majority opinion assumes, without analysis, that the question whether a person has had a substantial parental relationship with a child is a question for the jury. The majority opinion reviews the jury determination that the defendant failed to assume parental responsibility under a sufficiency of the evidence standard, considering the evidence in the light most favorable to the jury verdict. Majority op., ¶ 39. My sense is that a circuit court and an appellate court have a more significant role in deciding this constitutional issue than the majority opinion allows.

¶ 92. In sum, I conclude on the basis of the clear, unambiguous text of the introductory language of Wis. Stat. § 48.415 and the text of § 48.415(6)(b) that the determination of whether a parent has had a substantial parental relationship is a question of law for the court. My statutory interpretation is supported by the standard of review generally applied when an appellate court is presented with a case in which a constitutional standard must be applied to the facts.

¶ 93. For the reasons set forth, I join Justice Bradley's dissent and write separately.

¶ 94. ANN WALSH BRADLEY, J. (*dissenting*). This case presents the court with the question of whether a father's parental rights may be involuntarily terminated under Wis. Stat. § 48.415(6) when that father provided support throughout the pregnancy and daily care and supervision when the child was an infant.

¶ 95. Under the facts presented, I conclude that Jacob has had a substantial parental relationship with

---

[4] *Hajicek*, 240 Wis. 2d 349, ¶ 15.

his child. Once a parent has assumed a substantial parental relationship with the child, failure to maintain that parental relationship is not grounds for termination under sub. (6). Due process requires that other grounds for termination (*see, e.g.,* abandonment, Wis. Stat. § 48.415(1)), be proven before parental rights can be involuntarily terminated.

¶ 96. The majority concludes otherwise. In addressing the question, the majority transforms the statutory language. Rather than asking whether a parent "has had" a substantial parental relationship—as the statute directs—the majority asks whether there "is" a substantial parental relationship. *See* majority op., ¶ 26.

¶ 97. The majority's interpretation is contrary to the plain language of the statute, its context, and its legislative history. Its analysis is flawed because it appears to conceive of the existence of a protected liberty interest that is in constant flux, depending upon the totality of the circumstances at any given moment. As a result, the majority provides unclear guidance to fact-finders and undermines constitutional protections.

I

¶ 98. To properly interpret Wis. Stat. § 48.415(6), it is essential to understand the nature of the fundamental constitutional rights at stake when parental rights are involuntarily terminated. We have explained that "[t]ermination of parental rights adjudications are among the most consequential of judicial acts because they involve the power of the State to permanently extinguish any legal recognition of the rights and obligations existing between parent and child." *Brown County DHS v. Brenda B.,* 2011 WI 6, ¶ 30, 331 Wis. 2d 310, 795 N.W.2d 730.

319

¶ 99. Under most circumstances, parents have "cognizable and substantial" liberty interests in their relationships with their children. *Stanley v. Illinois*, 405 U.S. 645, 652 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 248 (1978). When a parent has a liberty interest, "the relationship between parent and child is constitutionally protected" and the State cannot interfere with that relationship unless the parent is determined to be unfit. *Quilloin,* 434 U.S. at 255; *Stanley,* 405 U.S. at 658.

¶ 100. The standard for failure to assume parental responsibility arose in the 1970s, as the United States Supreme Court grappled with the circumstances under which an unmarried father has a constitutionally protected interest in his relationship with his children. *See Stanley,* 405 U.S. at 650 (determining that an unmarried father had a liberty interest in "the children he has sired and raised" and that liberty interest warranted deference and protection); *Quilloin,* 434 U.S. at 255 (concluding that not all unmarried fathers have a liberty interest in their biological children); *Caban v. Mohammad,* 441 U.S. 380, 393 (1979) ("[I]n cases such as this, where the father has established a substantial relationship with the child," the relationship is constitutionally protected.).[1]

¶ 101. In *Quilloin,* the Court first articulated the standard under which it may be determined that a father's interest in his relationship with his biological child does not warrant constitutional protection. The *Quilloin* Court acknowledged that an unmarried father may have a constitutionally protected interest in his

---

[1] In dissent, Justice Stevens agreed that "if and when one develops, the relationship between a father and his natural child is entitled to protection against arbitrary state action as a matter of due process." *Caban v. Mohammad,* 441 U.S. 380, 414 (Stevens, J., dissenting).

relationship with his child. 434 U.S. at 247–48 (citing *Stanley*). Nevertheless, the Court concluded that Quilloin had no constitutionally protected interest because "he has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child."[2] *Id.* at 256.

¶ 102. The *Quilloin* Court contrasted parents who *have never had* any daily involvement in the child's life from those parents who *no longer have* daily involvement. It explained that Quilloin's situation was "readily distinguishable" from that of "a father whose marriage has broken apart" because in the latter situation, the father "will have borne full responsibility for the rearing of his children during the period of the marriage." *Id.* at 256. The Court implied that if a father has borne that responsibility at one point in the child's life, the father will have established a substantial parental relationship with his child and his rights cannot be terminated without a finding of unfitness.

¶ 103. In *Lehr v. Robertson*, 463 U.S. 248 (1983), the Court summarized the holdings of these cases. It explained that a "developed parent-child relationship" warrants constitutional protection, whereas a "potential relationship" based only on the "existence of a biological link" does not. *Id.* at 261. When a parent "accepts some measure of responsibility for the child's future" and "demonstrates a full commitment to the responsibilities of parenthood by coming forward to

---

[2] Accordingly, in such an instance the parent's unfitness need not be proven before parental rights may be terminated and a court need not "find anything more than that [terminating parental rights is] in the 'best interests of the child.'" *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978).

participate in the rearing of his child," the Court explained, the relationship is protected under the due process clause. *Id.*

¶ 104. Wisconsin courts have adhered to the constitutional framework set forth by the United States Supreme Court. A parent can establish a constitutionally protected interest by "living with her children and having custody of them." *Monroe County DHS v. Kelli B.*, 2004 WI 48, ¶ 24, 271 Wis. 2d 51, 678 N.W.2d 831. "[E]xcept under unusual circumstances like those presented in *Quilloin*," this court has explained, "the due process protections of the State and Federal Constitutions prohibit the termination of a natural parent's rights, unless the parent is unfit." *Mrs. R. v. Mr. & Mrs. B.*, 102 Wis. 2d 118, 136, 306 N.W.2d 46 (1981).

¶ 105. The constitutional framework set forth above should guide an interpretation of the statute. Wisconsin Stat. § 48.415(6) was originally enacted in 1979, shortly after *Quilloin* was decided.[3] § 6, ch. 330,

---

[3] When it was first enacted, the statute applied only to unmarried fathers. *See* Wis. Stat. § 48.415(6) (1979) ("Failure to assume parental responsibility may be established by a showing that a child has been born out of wedlock, not subsequently legitimized or adopted, that paternity was not adjudicated prior to the filing of the petition for termination of parental rights and: 1. The person or persons who may be the father of the child . . . have never had a substantial parental relationship with the child; or 2. That although paternity to the child has been adjudicated . . . the father did not establish a substantial parental relationship with the child prior to the adjudication of paternity[.]").

1995 Wis. Act 275, §§ 82–84 broadened the statute so that it could be applied to mothers as well as fathers, marital children as well as nonmarital children, and fathers for whom paternity was adjudicated prior to the filing of the TPR petition. Note to 1995 Wis. Act 275, § 83, 1995 Laws of Wisconsin at 1891.

Laws of 1979. Its definition of "substantial parental relationship" mirrored language from *Quilloin*.[4] It appears that the legislature's intent was to codify the standard that was set forth in *Quilloin* and later clarified in *Lehr*.

¶ 106. In addition to failure to assume parental responsibility, Wis. Stat. § 48.415 sets forth several other grounds for terminating parental rights.[5] Subsection (6) is qualitatively different from the other statutory grounds because it guides the threshold determination of whether the parent has a liberty interest that is entitled to constitutional protection. By contrast, the other grounds are unfitness determinations. They set forth standards for determining whether the rights of a parent who has a protected liberty interest may be involuntarily terminated because the parent is unfit.

## II

¶ 107. Although the majority acknowledges that Wis. Stat. § 48.415(6) sets forth the standard for determining whether a parent has a protected liberty inter-

---

[4] *Compare Quilloin,* 434 U.S. at 256 ("[Quilloin] has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child.") *with* Wis. Stat. § 48.415(6) (1979) (" '[S]ubstantial parental relationship' means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child.").

[5] Those grounds are abandonment, relinquishment, continuing need of protection or services, continuing parental disability, child abuse, incestuous parenthood, homicide or solicitation to commit homicide of parent, parenthood as a result of sexual assault, commission of a serious felony against one of the person's children, and prior involuntary termination of parental rights to another child.

est in his relationship with his child, majority op., ¶ 69, its statutory interpretation undermines such an interest. At times, it appears to recognize that the statutory language asks whether the parent "ha[s] not had" a substantial parental relationship. *Id.*, ¶¶ 24, 35. Nevertheless, it inexplicably converts the inquiry into "whether there *is* a substantial parental relationship." *Id.*, ¶ 26 (emphasis added). The majority concludes that "the statute gives latitude to the fact-finder to consider the entirety of the child's life and determine if the parent's actions have been sufficient to find" that he established a substantial parental relationship. *Id.*, ¶ 24.

¶ 108. The majority's interpretation is contrary to the plain language of the statute, its context, and its legislative history. As it has been amended through the years, the statute now provides that failure to assume parental responsibility "shall be established by proving that the parent or the person or persons who may be the parent of the child *have not had* a substantial parental relationship with the child." 48.415(6)(a) (emphasis added). Subsection (6)(b) defines "substantial parental relationship" as "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." 48.415(6)(b).[6]

---

[6] In full, Wis. Stat. § 48.415(6) provides:

(a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have not had a substantial parental relationship with the child.

(b) In this subsection, "substantial parental relationship means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including,

¶ 109. When the statutory text is cobbled together, it provides that failure to assume parental responsibility is established by proof that "the parent . . . ha[s] not had [the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child]." There are no statutory defenses to failure to assume parental responsibility.

¶ 110. The definition of "substantial parental relationship" includes "daily supervision, education, protection and care." Importantly, however, the statute does not ask whether the parent "does" exercise significant responsibility for the daily supervision, education, protection, and care of the child. Likewise, the statute does not ask whether there "is" a substantial parental relationship or whether the parent "has" a substantial parental relationship with the child. Rather, the statute asks whether the parent "has had" a substantial parental relationship. *See* Wis. Stat. § 48.415(6)(b).

¶ 111. By using a verb in the past tense, the legislature set out the relevant inquiry: in the past, did the parent accept and exercise significant responsibility for the daily supervision, education, protection, and care of the child? If the answer is yes, then the parent *has had* a substantial parental relationship with the child, and parental rights may not be involuntarily terminated under Wis. Stat. § 48.415(6). In such a case, due process requires that other grounds for termination be proven before parental rights can be involuntarily terminated.

but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

¶ 112. This plain language interpretation finds support in the title of the statutory subsection. The title of sub. (6) indicates that the relevant inquiry is whether the parent failed to *assume* a parental relationship. It does not indicate that the statutory requirements are met when a parent fails to *maintain* a relationship that was at one point assumed.

¶ 113. Likewise, this interpretation finds support in context with the surrounding statutes and in the legislative history. Statutory language must be interpreted in relation to the language of surrounding or closely related statutes. *Sands v. Whitnall Sch. Dist.*, 2008 WI 89, ¶ 15, 312 Wis. 2d 1, 754 N.W.2d 439. Among other inquiries, courts look to whether a construction would render other statutory sections superfluous. "A basic rule of this court in constructing statutes is to avoid such constructions as would result in any portion of the statute being superfluous." *State v. Wachsmuth,* 73 Wis. 2d 318, 324, 243 N.W.2d 410 (1976).

¶ 114. As discussed above, Wis. Stat. § 48.415(6) is part of a larger statutory framework which lists other grounds for involuntary termination of parental rights. One of those grounds is abandonment.

¶ 115. Wisconsin Stat. § 48.415(1)(a)3 provides that abandonment may be established if the petitioner proves that "[t]he child has been left by the parent with any person, the parent knows or could discover the whereabouts of the child and the parent has failed to visit or communicate with the child for a period of 6 months or longer." The jury instruction provides significant direction to jurors in order to guide their deliberation. For example, it sets forth a definite time period—six months. It also provides that incidental contact between the parent and child, defined as insignificant contact or

contact that occurred merely by chance, does not prevent the jury from finding abandonment. Wis. JI-Children 314.

¶ 116. The jury instruction also sets forth a parent's defenses to abandonment, which protect parental rights from arbitrary termination. The jury cannot find abandonment if the parent had good cause for having failed to visit or communicate with the child during that period, and the parent either communicated with the person who had physical custody of the child about the child during that period or the parent had good cause for failing to do so. The jury is instructed that it may consider the legitimacy of the parent's reasons for failing to visit or communicate with the child or the person who had physical custody of the child.

¶ 117. An interpretation of Wis. Stat. § 48.415(6) that allows the fact-finder to "consider the entirety of the child's life [to] determine if the parent's actions have been sufficient to find" that he established a substantial parental relationship, majority op., ¶ 24, would appear to render superfluous the ground for termination established by sub. (1)(a)3. Under that interpretation, failure to assume parental responsibility would amount to little more than a watered-down version of abandonment with no defenses.

¶ 118. It is difficult to imagine that a petitioner would go through the trouble to allege and prove abandonment (a ground for termination that provides the parent with defenses) when it would be much easier to prove failure to assume parental responsibility (a ground for termination to which there is no defense). The legislature could not have intended that failure to assume parental responsibility swallows the specific ele-

327

ments and defenses set forth in the abandonment statute.[7]

¶ 119. I turn next to the legislative history. Up until 2005, Wis. Stat. § 48.415(6) permitted the termination of parental rights if the parents "have never had a substantial parental relationship with the child[.]". This language was reexamined by the Special Committee on Adoption & Termination of Parental Rights Laws.

¶ 120. The majority's review of the legislative history is incomplete. Over the course of many months, from August 2004 to December 2004, the special committee considered a number of different iterations in

---

[7] For the same reason, an interpretation that allows the fact-finder to consider whether the parent "exposed the child to a hazardous living environment," *see* majority op., ¶ 37, would appear to render another subsection of the statute superfluous.

Continuing need of protection or services is another ground for involuntary termination of parental rights. Wis. Stat. § 48.415(2). A child may be adjudged in need of protection or services when the child has been the victim of abuse or when the parent neglects, refuses, or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child. Wis. Stat. § 48.13. The court enters a dispositional order directing that specific services be provided to the child and family. Wis. Stat. § 48.355(2)(b)1. A parent has a defense to grounds for termination for continuing need of protection or services if the county failed to make a reasonable effort to provide the services to the child and family. Wis. Stat. § 48.415(2)(a)2.b.

If a fact-finder is permitted to conclude that a parent failed to establish a parental relationship because the parent exposed the child to a hazardous living environment, then counties would not be required to help parents develop the skills necessary to retain custody of their children. Rather, they could avoid the trouble and expense by simply alleging failure to assume a parental relationship.

revising the standard for failure to assume parental responsibility. The majority relies heavily upon a letter written by a member of the special committee.[8] Majority op., ¶ 29. This letter was submitted in September, early in the drafting process. A review of the complete legislative history reveals that the special committee considered—and rejected—a standard that was based on its recommendation.

¶ 121. At the meeting held on October 13, 2004, the special committee considered draft legislation that contained the following proposed change employing the present tense: "Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have never do not have a substantial parental relationship with the child."[9] Ultimately, the special committee declined to adopt it.

¶ 122. At the December 14 meeting, a staff attorney introduced a revised draft and "explained that the draft bill requires proof that the parent has not had a substantial parental relationship with the child instead of proof that the parent does not have a substantial parental relationship with the child, as was required in the first version of the bill draft."[10] This draft was approved unanimously.

---

[8] *See* Attachment to the Memo from Judge Christopher Foley to Members of Legislative Committee on TPR and Adoption, September 22, 2004 (on file with the Wisconsin State Legislature Legislative Council).

[9] *See* Wisconsin Legislative Council draft WLC:0015/1 (September 30, 2004) (on file with the Wisconsin State Legislature Legislative Council) (emphasis in original).

[10] Minutes from the December 14, 2004 meeting of the Special Committee on Adoption and Termination of Parental Rights Law, at 3 (discussing Wisconsin Legislative Council draft WLC:0015/2 (October 18, 2004)) (emphasis in original).

¶ 123. From this legislative history, it is apparent that the special committee considered and ultimately rejected an amendment that would change the past-tense verb "have never had" to the present tense verb "do not have." Rather, the committee intentionally selected the past-tense verb, "have not had," that appears in the statute today.

¶ 124. Based on the constitutional concerns underlying the statute, the plain language of the statute, its context, and its legislative history, I conclude that a father's parental rights may not be involuntarily terminated under Wis. Stat. § 48.415(6) when that father assumed parental responsibility by providing support throughout the pregnancy and daily care and supervision when the child was an infant. Once a parent has assumed a substantial parental relationship with the child, failure to maintain that parental relationship is not grounds for termination under sub. (6). Rather, due process requires that other grounds for termination, such as abandonment, be proven before parental rights can be involuntarily terminated.

¶ 125. In this case, it is undisputed that Jacob had assumed a substantial parental relationship with his daughter throughout Tammy's pregnancy and for the first several months of Gwenevere's life. According to Tammy's testimony, she and Jacob lived together for a year or a year-and-a-half before Gwenevere was born, and both parents were excited about the coming birth of their child. Tammy testified that Jacob drove her to doctors appointments throughout the pregnancy and that he was present when Gwenevere was born. She told the jury: "I cried, and [Jacob] shed tears."

¶ 126. Jacob and Tammy continued to live together for the first four months of Gwenevere's life. Tammy testified that Jacob "was a stay at home dad at

that time." She testified that during the months they lived together as a family, Jacob "never ignored" Gwenevere, that he "took care of her," that he bathed her, and that "he changed her and fed her when I was, you know, in bed taking a nap, resting, or at work."

¶ 127. Under the facts presented here, I conclude that Jacob has had a substantial parental relationship with his child. Accordingly, the circuit court should have entered a directed verdict in his favor.

III

¶ 128. The court of appeals recommended that we accept certification of this case to "resolve the ambiguities and uncertainties regarding the use of Wis. Stat. § 48.415(6)[.]" *Tammy W.G. v. Jacob T.*, No. 2009AP2973, certification memo at 1 (Wis. Ct. App. Apr. 22, 2010). Rather than resolving any ambiguities and uncertainties, I am concerned that the majority has compounded them. It appears to conceive of the existence of a protected liberty interest that is in constant flux, depending upon the totality of the circumstances at any given moment. This analysis provides unclear guidance to fact-finders and undermines constitutional protections.

¶ 129. According to the majority, the fact-finder should consider "all the facts up until the time of the fact-finding hearing to decide if the parent has engaged in the requisite behavior." Majority op., ¶ 26 (emphasis omitted). It should consider the reasons why a parent has not supported the child. *Id.*, ¶ 32. Nevertheless, it should be mindful that a parent's lack of opportunity to establish a substantial relationship is not a defense to this ground for involuntary termination. *Id.*, ¶ 38. Finally, while the fact-finder may not consider the

"amorphous" concept of the "quality of parenting," *id.*, ¶ 36, it should consider whether the parent "exposed the child to a hazardous living environment." *Id.*, ¶ 37. The fact-finder is left to determine whether circumstances such as smoking cigarettes or having guns in the house are sufficiently hazardous to factor into its determination of whether the parent failed to assume parental responsibility for the child.

¶ 130. Based on these instructions, what is a conscientious fact-finder to do? Under the majority's guidance, it appears that the fact-finder could easily base its determination on a recent period of absence or poor quality parenting—rather than on whether the parent "has had" a substantial parental relationship, as the statute directs.

¶ 131. It may be that, based upon the totality of the circumstances up until the child's first birthday, the parent has established a liberty interest in the relationship with his child. However, if that same parent fails to exercise significant responsibility for the daily supervision, education, protection, and care between ages one and two, can the parent be said to have lost that liberty interest? And then, if the parent assumes more responsibility after the child's second birthday, is the parent's liberty interest revived?

¶ 132. The existence of a liberty interest protected by the state and federal constitutions cannot be so ephemeral. The *Quilloin* Court contrasted parents who *no longer have* any daily involvement in the child's daily life from those parents who *have never had* daily involvement. It concluded that a parent who has borne that responsibility at one point in the child's life has established a substantial parental relationship with his child, and that relationship is entitled to constitutional protection under the due process clause.

¶ 133. "[W]here the constitutionality of a statute is at issue, courts [should] attempt to avoid an interpretation that creates constitutional infirmities." *Kenosha County DHS v. Jodie W.*, 2006 WI 93, ¶ 20, 293 Wis. 2d 530, 716 N.W.2d 845. The majority takes the opposite tack. By contorting the statutory language, the majority undermines the distinction made in *Quilloin* and subjects the statute to constitutional infirmities.[11] Accordingly, I respectfully dissent.

---

[11] In addition, by asserting that "in an as-applied challenge, neither party faces a presumption that the statute was constitutionally applied," *see* majority op., ¶ 48, the majority needlessly engenders confusion about the proper standards for constitutional challenges.

The majority's pronouncement is contrary to several recent opinions of this court. *See, e.g., State v. Wood*, 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63 ("[W]e review a statute under the presumption that it is constitutional. Accordingly, the party raising the constitutional claim . . . must prove that the challenged statute is unconstitutional beyond a reasonable doubt. That presumption and burden apply to facial as well as to as-applied constitutional challenges."); *State v. Smith*, 2010 WI 16, ¶¶ 8–9, 323 Wis. 2d 377, 780 N.W.2d 90 ("A statute enjoys a presumption of constitutionality. . . . [In this as-applied challenge] Smith must prove that as applied to him, § 301.45 is unconstitutional beyond a reasonable doubt.").

The majority's assertion finds support in *Society Insurance v. LIRC*, 2010 WI 68, 326 Wis. 2d 444, 786 N.W.2d 385. That case contained the following explanation: "In an as-applied challenge, our task is to determine whether the statute has been enforced in an unconstitutional manner. . . . Because the legislature plays no part in enforcing our statutes, 'deference to legislative acts' is not achieved by presuming that the statute has been constitutionally applied." *Society Ins.*, 386 Wis. 2d 444, ¶ 27.

The explanation from *Society Insurance* reveals a fundamental misunderstanding of the court's inquiry in an as-applied

¶ 134. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.

challenge. Twelve days after *Society Insurance* was mandated, a unanimous opinion of this court rejected any distinction between the presumption of constitutionality in facial and as-applied challenges. *See State v. McGuire,* 2010 WI 91, ¶ 25, 328 Wis. 2d 289, 786 N.W.2d 227 ("Statutes are presumed to be constitutional, and a party challenging a statute's constitutionality must demonstrate that it is unconstitutional beyond a reasonable doubt. This presumption and burden apply to as-applied constitutional challenges to statutes as well as to facial challenges.").