BRASH, J.[1]
¶ 1 R.O. appeals an order of the trial court terminating his parental rights of Z.J.E. He argues that the trial court erred in its instruction to the jury regarding a court order relating to visitation, specifically as it applies to the abandonment ground for the termination of parental rights. R.O. further claims that the evidence was not sufficient to support the jury's verdict that he had failed to assume parental responsibility. We disagree and affirm.
BACKGROUND
¶ 2 R.O. is the biological father of Z.J.E., who was born May 11, 2010. Z.J.E.'s mother is K.M., who had a relationship with R.O. during high school and college. It was during this time that K.M. became pregnant with Z.J.E. K.M. and R.O. never married.
¶ 3 K.M. and R.O. moved in with K.M.'s parents shortly before Z.J.E. was born. They continued living there after Z.J.E. was born, with K.M.'s parents providing them with financial assistance and helping to care for the baby. R.O. contributed nothing to the household finances and did little to assist with the care of Z.J.E.
¶ 4 Additionally, R.O. had a long history of alcohol abuse that sometimes involved violent behavior toward K.M. He also regularly carried knives and loaded guns that he would take out and "flaunt." When Z.J.E. was around one year old, R.O. left a loaded gun on the floor in an area where Z.J.E. crawled. R.O. also brought out a loaded shotgun at a party being held at K.M.'s parents' house; R.O. was intoxicated, and K.M.'s father had to wrestle the gun away from him. R.O. blamed his behavior on being a combat veteran; however, while R.O. did serve in the army, he did not see combat.
¶ 5 In July 2011, R.O. was arrested and charged with attempted second-degree intentional homicide. After a day of drinking, R.O. and K.M. were at Summerfest when R.O. got into an altercation with a man he did not know and stabbed him. R.O. was convicted in June 2012 and was sentenced in September 2012 to thirteen years, bifurcated as eight years of initial confinement and five years of extended supervision.
¶ 6 While that criminal case was pending and R.O. was out on bail, he was charged with disorderly conduct after an incident at K.M.'s parents' house in March 2012. The incident began with R.O. sending K.M. a number of texts, accusing her of having sexual relations with other men. K.M. assumed that he had been drinking, so she called him and told him to stay somewhere else that night, especially since K.M.'s father was away from the residence for the weekend. Later that night, after K.M. had gone to bed, she heard rocks being thrown at her windows, and then a thud on the roof. K.M. ran downstairs with Z.J.E. and told her mother to call the police. The S.W.A.T. team responded and pulled R.O. off of the roof of the house and arrested him for disorderly conduct.
¶ 7 Based on R.O.'s arrest for the roof incident, a no-contact order went into effect preventing R.O. from having contact with K.M. and her mother. R.O.'s bail conditions for the attempted homicide charge were also modified in March 2012 to prohibit contact with K.M. and her family; however, third-party contact with K.M. was allowed "to facilitate visitation with [the] child or to facilitate childcare issues[.]" That order remained in effect until R.O. was sentenced on the attempted homicide conviction in September 2012. At that sentencing, R.O. was advised that he could have no contact with Z.J.E. until he was adjudicated the father.
¶ 8 After R.O.'s sentencing, a paternity action against R.O. was commenced by the Milwaukee County Department of Child Support Services as a result of K.M.'s application for food stamps and insurance through the state. However, the case was dismissed after K.M. sought and received a finding that there was good cause to relieve her of her obligation to cooperate with the action, since it may have resulted in physical harm to either her or Z.J.E. R.O. did not respond to the information sent to him by Child Support Services relating to the establishment of paternity when that action was commenced, nor did he pursue the issue after the matter was dismissed.
¶ 9 Additionally, R.O. was sentenced in February 2015 on a conviction of operating while intoxicated (OWI)-second offense.[2] He was ordered by that trial court to "start the process to establish paternity" of Z.J.E. within two weeks of the sentence. He never did so. In sum, R.O. never sought to be adjudicated as the father of Z.J.E.
¶ 10 K.M.'s relationship with R.O. effectively ended after the roof incident in March 2012. She eventually married in 2016, and her husband desired to adopt Z.J.E. Thus, in April 2017, K.M. filed a petition for the termination of parental rights (TPR) of R.O. with regard to Z.J.E. In that petition, K.M. alleged two grounds for termination: (1) abandonment, pursuant to WIS. STAT. § 48.415(1) ; and (2) failure to assume parental responsibility, pursuant to § 48.415(6).[3]
¶ 11 The matter went to trial before a jury in late January 2018. With regard to the claim of abandonment, the trial court explained that to establish this claim, the jury had to calculate the time period during which R.O. had no communication with Z.J.E., but it should not include any time that R.O. was prohibited by court order from contacting Z.J.E. The trial court further indicated, however, that "a court order which prohibits a parent from visiting and/or communicating until the parent meets certain conditions which the parent can meet through reasonably diligent efforts does not prohibit the parent from visiting and/or communicating with the child."
¶ 12 During deliberations, the jury asked about the provisions of the no-contact order. Specifically, they sent a note asking whether R.O. was "able to legally contact [K.M.] and/or [Z.J.E.] between March and October 2012[.]" After reviewing the question, the trial court realized that the information relating to the modified bail conditions-effective March 2012 through R.O.'s sentencing in September 2012, the time frame in question-had not been entered into evidence. Upon agreement of the parties, the trial court took judicial notice of the contact provisions set forth in the bail modification, reopened the evidence of the TPR case, and brought the jury back into court to communicate the information to them.
¶ 13 Subsequently, the jury returned verdicts finding grounds existed for both the abandonment and failure to assume parental responsibility claims. After a dispositional hearing in February 2018, the trial court determined that it was in Z.J.E.'s best interest that R.O.'s parental rights be terminated. This appeal follows.
DISCUSSION
¶ 14 R.O. first argues that the trial court erroneously exercised its discretion in giving the jury instruction related to calculating the time period for establishing abandonment. "It is well established that a trial court has broad discretion when instructing a jury." White v. Leeder , 149 Wis. 2d 948, 954, 440 N.W.2d 557 (1989). "If an appellate court can determine that the overall meaning communicated by the instruction as a whole was a correct statement of the law, and the instruction comported with the facts of the case at hand, no grounds for reversal exist[ ]." Id. at 954-55.
¶ 15 Abandonment is established if it can be demonstrated that "[t]he child has been left by the parent with any person, the parent knows or could discover the whereabouts of the child and the parent has failed to visit or communicate with the child for a period of 6 months or longer." WIS. STAT. § 48.415(1)(a)3. These requirements are set forth in WIS JI-CHILDREN 314, one of the instructions provided to the jury in this case. That instruction explains that with regard to any no-contact order issued by a court, the jury should take that time frame into consideration: "[i]n calculating any period during which communication did not occur, [the jury] should not include any period during which [the parent] was prohibited by judicial order from communicating with [the child]." Id. However, the trial court here added a sentence to the boilerplate verbiage of the jury instruction: "[h]owever, a court order which prohibits a parent from visiting and/or communicating until the parent meets certain conditions which the parent can meet through reasonably diligent efforts does not 'prohibit' visitation and/or communication."
¶ 16 Prior to instructing the jury, the trial court held a conference with the parties on the record to specifically discuss this addition. During that discussion, the trial court referenced the "keys to the door" rule, established in Carla B. v. Timothy N. , 228 Wis. 2d 695, 706, 598 N.W.2d 924 (Ct. App. 1999). In Carla B. , a father appealed the termination of his parental rights on abandonment grounds, arguing that he had been prohibited from visiting his daughter by a family court order. Id. at 702. This court disagreed, finding instead that the trial court had allowed for supervised visitation if the father saw a therapist and the therapist was able to establish that the visits would not be harmful to the child. Id. at 706. In other words, the trial court had "create[d] a condition precedent that [the father] had to fulfill before he could exercise visitation" that gave the father "the keys to the door" for visitation. Id.
¶ 17 The trial court here found that this case, too, involved a "keys to the door" situation because of the conditions precedent set forth in the no-contact orders issued by the criminal court that heard R.O.'s attempted homicide case. In particular, when R.O. was sentenced for the attempted homicide conviction in September 2012, he was prohibited from having contact with Z.J.E. until he was adjudicated as her father . He never did so. Additionally, prior to that-in March 2012, when R.O.'s bail conditions were modified after the roof incident to prohibit contact with K.M. and her family-the criminal court still permitted third-party contact with K.M. "to facilitate visitation with [the] child or to facilitate childcare issues[.]" R.O. did not pursue that option, either.
¶ 18 In his argument that the trial court erred in including the additional sentence in the jury instruction, R.O. contends that Carla B. "creates more questions than it answers," particularly with regard to whether the condition precedent is a question of law or of fact. R.O.'s support for this argument lies in a footnote of the Carla B. decision, where the court recognizes that there may be cases where the parent is unable to fulfill a condition precedent similar to the one imposed on the father in that case because the condition relied on the opinion of a therapist. Carla B. , 228 Wis. 2d at 706 n.3.
¶ 19 However, the condition precedent in this case was entirely different, because R.O. was in charge of his own fate. In fact, the added provision in the jury instruction-which was then supplemented by additional evidence relating to the no-contact order in response to the jury's question about the time frame between March and September 2012-put the fact-finding required for this question in the hands of the jury.
¶ 20 Thus, we conclude that the trial court appropriately used its discretion in including a provision in the jury instruction to address facts that were directly relevant to the jury's fact-finding mission, after correctly applying the binding case law of Carla B . Therefore, there are no grounds for reversal. See White , 149 Wis. 2d at 954-55.
¶ 21 R.O. also argues that there was insufficient evidence to support the jury's verdict that he had failed to assume parental responsibility. In order to prove this claim, it must be demonstrated that the parent did not have a "substantial parental relationship" with the child, which is defined as "exercis[ing] ... significant responsibility for the daily supervision, education, protection and care of the child." WIS. STAT. § 48.415(6). The application of this statute to the facts of a case, and whether the evidence is sufficient to support a jury's verdict, are questions of law that we review de novo . Tammy W-G. v. Jacob T. , 2011 WI 30, ¶¶ 16-17, 333 Wis. 2d 273, 797 N.W.2d 854.
¶ 22 The evidence in this case showed that: while R.O. was living with Z.J.E., K.M., and her parents, he provided very little in the way of care and financial support for Z.J.E.; he abused alcohol and displayed violent behavior toward K.M. when he was intoxicated; and he was reckless with loaded firearms. Furthermore, his violent behavior seemed to be escalating, as he had to be removed from the roof of the residence while trying to gain entry after sending threatening texts to K.M. He was also, of course, convicted of attempting to kill a man over a minor altercation. This evidence overwhelmingly shows that R.O. was not assuming parental responsibility for the care and protection of Z.J.E.
¶ 23 Moreover, although there were no-contact orders in place after his arrest for the roof incident, R.O. still had the opportunity to be allowed communication and visitation with Z.J.E. by initiating proceedings to establish his paternity. Furthermore, he was subsequently ordered by the sentencing court for his 2015 OWI conviction to commence paternity proceedings within two weeks of that sentencing; indeed, he was advised by that court that the responsibility of establishing paternity was solely up to him. R.O. ignored that order. This failure to take action to establish paternity-especially given that communication and visitation with Z.J.E. was dependent on it-is also indicative of a failure to assume parental responsibility.
¶ 24 Therefore, we conclude that there is sufficient evidence to support the jury's verdict. Accordingly, because there are no grounds for reversal on either of R.O.'s claims, we affirm.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The operating-while-intoxicated offense was committed by R.O. in October 2010.

Because R.O. had never been adjudicated as the father of Z.J.E., a paternity test was ordered by the court after the TPR petition was filed; that test established that R.O. is Z.J.E.'s biological father.