# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 23, 2021

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | | |
|---|---|---|
| **Appeal Nos.** | **2021AP739** | Cir. Ct. Nos. 2019TP151 |
| | **2021AP740** | 2019TP152 |
| | **2021AP741** | 2019TP153 |
| | **2021AP742** | 2019TP154 |

**STATE OF WISCONSIN** | **IN COURT OF APPEALS**
**DISTRICT I**

APPEAL NO. 2021AP739

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.T., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

T. T.,

      RESPONDENT-APPELLANT.

APPEAL No. 2021AP740

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M.T., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

T. T.,

      RESPONDENT-APPELLANT.

APPEAL No. 2021AP741

IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.T., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

T. T.,

      RESPONDENT-APPELLANT.

APPEAL NO. 2021AP742

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.T., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

T. T.,

RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1 DUGAN, J.[1] The State filed a petition to terminate Tyler's[2] parental rights to his four children on August 28, 2019.[3] As grounds, the petition alleged that Tyler failed to assume parental responsibility and that the children were in continuing need of protection or services (Continuing CHIPS). The

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] For ease of reading and to protect confidentiality, we use a pseudonym when referring to the father and the mother in this case.

[3] The petition also included the rights of the mother, but the mother's rights are not at issue in this appeal.

grounds phase was contested and tried to the court. At the end of the hearing, the trial court found that the State proved both grounds and, therefore, Tyler was an unfit parent. The case moved to the dispositional phase of the proceedings. Following the disposition hearing, the trial court found that it was in the children's best interests to terminate Tyler's parental rights. Tyler appeals and argues that the trial court erred when it found that the State proved both grounds alleged in the petition and that the trial court erroneously exercised its discretion in weighing the factors during the dispositional phase of the proceedings. For the reasons set forth below, we affirm.

## BACKGROUND

¶2    Tyler started a romantic relationship with his stepdaughter, Caroline, in 2010 when she turned eighteen. Tyler and Caroline had their first child in 2012. However, the couple did not live together and did not have an exclusive relationship, and thus, Tyler testified that he had doubts that he was the father of the child. Caroline had another child in 2013 and a third child in 2015, and Tyler testified that he similarly doubted he was the father of these children. Tyler then moved in with Caroline and the children in 2015, and when Caroline had a fourth child in 2017, Tyler testified that he believed he was the father of the child. Tyler did not take any steps to determine if he was the father of the first three children until October 2017, when DNA testing was completed in connection with this case.

¶3    The Division of Milwaukee County Child Protective Services (DMCPS) began receiving reports about Caroline's ability to care for the children starting in 2012 when concerns arose about possible neglect and abuse of the first

child.   Then, in 2015 when Tyler moved into the home with Caroline and the children, the DMCPS began receiving additional reports about possible violence in the home.   In 2016, the DMCPS began receiving reports about further concerns over the cleanliness and overall safety of the home following observations that there were items such as open pill bottles, knives, and hot coffee pots left within the children's reach and the children were left unsupervised.

¶4     In September 2017, the DMCPS removed the children from the home after the protective plan[4] that DMCPS put in place failed, and the children have been living outside the parental home since the time of their removal in September 2017.

¶5     On November 6, 2017, the trial court found that the children were in need of protection or services, and it subsequently entered a dispositional order on April 6, 2018, placing the children outside of the parental home until such time as certain conditions of return could be satisfied by Tyler and Caroline.

¶6     The State then filed a petition to terminate the parental rights of both Tyler and Caroline on August 28, 2019.   As grounds to terminate Tyler's parental rights, the State alleged Continuing CHIPS and that Tyler failed to assume parental responsibility.   The petition supported the Continuing CHIPS grounds stating that Tyler was unable to complete the conditions for the return of the children because, among other things, there were concerns about ongoing

---

[4] The initial assessment worker who put the protective plan in place testified that "[a] protective plan is used during … an immediate situation where there is a present danger."   She further testified that it allows the DMCPS to "work with the family" in the short-term while a long-term solution is put into place and that she put a protective plan in place for this family because the domestic violence was a present danger.

5

domestic violence between Tyler and Caroline, concerns about Tyler controlling Caroline, and concerns that Tyler expected Caroline to be the primary caregiver for the children when Caroline had intellectual deficiencies that made it difficult for her to do so. The petition also supported the grounds of failure to assume parental responsibility by detailing the history of reports that the DMCPS received in connection with these children and listed the reports of Tyler's behavior towards Caroline and the children.

## DISCUSSION

¶7     "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the first phase, called the "grounds" phase, "the petitioner must prove by clear and convincing evidence" that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists. *Steven V.*, 271 Wis. 2d 1, ¶¶24-25; *see also* WIS. STAT. § 48.31(1). If the petition is contested, as it was here, "[t]he first step of the proceeding is the fact-finding hearing," the purpose of which is "to determine whether grounds exist for the termination of parental rights." *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854 (citation omitted).

¶8     In the second phase, often referred to as the "dispositional phase," the court must decide if it is in the child's best interest that "the parent's rights be permanently extinguished." *Steven V.*, 271 Wis. 2d 1, ¶¶26-27; *see also* WIS. STAT. § 48.426(2). "At the dispositional hearing, the court must consider any agency report submitted and the six factors enumerated in § 48.426(3) in

6

determining the best interests of the child." *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶4, 255 Wis. 2d 170, 648 N.W.2d 402.

¶9      The court will uphold the trial court's decision to terminate parental rights "if there is a proper exercise of discretion." *State v. Margaret H.*, 2000 WI 42, ¶32, 234 Wis. 2d 606, 610 N.W.2d 475. "A proper exercise of discretion requires the circuit court to apply the correct standard of law to the facts at hand." *Id.* This court will not set aside the trial court's factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2). This court also reviews the sufficiency of the evidence as a question of law. *See Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶18, 325 Wis. 2d 524, 785 N.W.2d 369.

¶10     Tyler argues that the trial court erred when it found that the State proved the Continuing CHIPS grounds because the DMCPS failed to make a "reasonable effort" to provide services to him. *See* WIS. STAT. § 48.415(2)(a)2. (listing as one of the elements of a Continuing CHIPS ground as the responsible agency "has made a reasonable effort to provide the services ordered by the court"). Specifically, Tyler argues that the DMCPS failed to take into account the limitations that his incarceration placed on him when it attempted to provide him services. *See State v. Raymond C.*, 187 Wis. 2d 10, 12-15, 522 N.W.2d 243 (Ct. App. 1994) (concluding that the effort to provide "court-ordered services" to a "developmentally disabled and unable to read" parent must be "examined in light of [the parent's] limitations").

¶11     What Tyler fails to recognize in making this argument, however, is that Tyler was not incarcerated for the majority of the time that the DMCPS provided services. The DMCPS became involved with providing services when

7

the children were removed from the parental home in September 2017, and the children were found by the court to be in need of protection or services in November 2017. When the court entered the CHIPS dispositional order on April 6, 2018, the DMCPS continued to provide many of the same services that were already being offered. Tyler did not become incarcerated until July 2019,[5] and the State then filed the petition to terminate Tyler's parental rights on August 28, 2019—the time to complete the court ordered services had largely passed.[6]

¶12    Indeed, Tyler testified to his efforts and acknowledged that the DMCPS was making an effort to provide him services from the time the children

---

[5] Tyler was on probation for a conviction for "possession with the intent to deliver cocaine and felon in possession of a firearm." He was incarcerated in July 2019, for a violation of his probation following a domestic violence incident involving Caroline. Tyler's probation agent testified that Caroline reported the incident to her and described that Tyler "turned the TV all the way up so that no one could hear her crying, that he grabbed her by her hair, [and] that he hit her in the face."

[6] As part of the Continuing CHIPS grounds, the State is required to prove that the parent "has failed to meet the conditions established for the safe return of the child to the home." WIS. STAT. § 48.415(2)(a)3. However,

> if the child has been placed outside the home for less than 15 of the most recent 22 months, [the petitioner must show] that there is a substantial likelihood that the parent will not meet these conditions as of the date on which the child will have been placed outside the home for 15 of the most recent 22 months[.]

*Id.* By August 2019 when the State filed the petition to terminate Tyler's parental rights, Tyler's children had been placed outside the home for more than 15 of the most recent 22 months.

This court notes that, in his brief, Tyler states that "[t]o demonstrate a continuing need of protection or services as a ground for TPR in this case, the following four elements must be proven … (4) There is a substantial likelihood that [Tyler] will not meet these conditions within the 9-month period following the termination fact-finding hearing." Our legislature eliminated the 9-month failure to meet requirement when it amended WIS. STAT. § 48.415(2)(a)3. *See* 2017 Wis. Act 256, § 1. The statute now reads as stated above. Tyler makes no argument regarding this element and, therefore, this court does not discuss it.

8

where removed from the home in September 2017. For example, Tyler testified that he had an AODA assessment right away in November 2017. He also testified that he attended several sessions of couples counseling with Caroline and completed parenting classes after the case manager had assisted him with those services. He further testified that the case manager arranged visits through an organization called "SaintA"[7] and that, for a period of time, he was having visits with the children at his home until June 2019 when concerns arose about bed bugs and cockroaches in the home.

¶13 Despite Tyler's testimony about his participation in the services provided, several other witnesses testified that Tyler precluded the DMCPS from moving forward with providing services because Tyler failed to acknowledge that his relationship with Caroline was plagued by domestic violence. In fact, even at the hearing on the grounds phase, Tyler testified that there was "not hitting" in his relationship with Caroline.

¶14 Yet, other witnesses, including Caroline, testified to ongoing concerns about domestic violence. The initial assessment worker testified that DMCPS was originally prompted to remove the children from the home in September 2017 in part because of concerns of domestic violence in the home that put both Caroline and the children at risk. She testified that when she first met with Caroline, Caroline reported that Tyler "had hit her several times in the face with an open hand." She further testified that Caroline described an incident

---

[7] SaintA is a human services organization that strives to address the impact of trauma, prevent adversity and promote resilience for the people in its care, including among other things, foster care, education, and mental health services for individuals and families. *See* https://sainta.org/about-us/ (last visited July 20, 2021).

where Tyler had choked her and another incident where Tyler had "busted her lip." Caroline also testified that the children were removed because of domestic violence because Tyler "was putting his hand on [her]" and "[she] just be having marks on [her] face." One of the case managers also testified that Caroline's sister stayed with Caroline and Tyler for a period of time because of "issues in their relationship" and because Tyler "got in her face." She further testified that Caroline would report that Tyler would spit in her face and "physically put his hand on her."

¶15    Testimony from several witnesses at the hearing also showed that the DMCPS was not able to move forward in providing services because Tyler showed a lack of motivation to care for the children himself or assist Caroline in providing for the children. During home visits, Tyler would delegate tasks involving the children to either Caroline or another adult. In fact, in response to a question asking Tyler if he believed that he "delegated things for [Caroline] to do in parenting," he responded, "The only thing I know in the house is the coffee pot because [Caroline] take care of everything. [Caroline] take care of me…." Tyler also testified that it "was never brought to [his] attention" that Caroline did not have the ability to parent the children on her own. There was also testimony that Tyler was not able to maintain a job, spent periods of time not working, and was even homeless at one point. Thus, there were also concerns over Tyler's ability to care for the children and provide for their needs that precluded the DMCPS from moving forward in providing services to Tyler.

¶16    This court does not see Tyler's incarceration as a limitation on the DMCPS' efforts to provide services to Tyler, and the DMCPS' efforts were not the reason that Tyler was unable to complete the court ordered services for the

return of his children. As the trial court stated, Tyler's testimony about his relationship with Caroline and his testimony that there was no physical domestic violence in their relationship was "a flat out lie and not recognizing that made it impossible for the [DMCPS] to move forward." This court concludes that the trial court did not err in finding that the DMCPS made reasonable efforts to provide Tyler the court ordered services and that the State had proved the Continuing CHIPS grounds.

¶17    Tyler next argues that the trial court erred when it found that the State proved that Tyler failed to assume parental responsibility because Tyler did not have a "substantial parental relationship" with the children. *See* WIS. STAT. § 48.415(6)(a) (requiring proof that there was no "substantial parental relationship with the child" for failure to assume parental responsibility). A substantial parental relationship "means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). "[A] fact-finder must look to the totality-of-the-circumstances to determine if a parent has assumed parental responsibility," and "the fact-finder should consider the circumstances that have occurred over the entirety of the child's life." *Tammy W-G.*, 333 Wis. 2d 273, ¶22.

¶18    Tyler testified that he babysat the children on a regular basis starting in 2012 until 2015 when he then moved in with Caroline and cared for the children as a stay-at-home parent. In fact, he testified that he saw the children "every day." He further testified that they have remained in contact during his incarceration by exchanging letters and drawings.

11

¶19    While Tyler may have testified as such, there were several other witnesses who testified in support of the opposite conclusion. Indeed, even Tyler himself testified that he did not recognize three of his four children as his until the DNA testing that was completed in October 2017 showed that he was most likely the father. As noted earlier, there was also testimony that Tyler would delegate tasks involving the care of the children to others and Tyler would avoid providing the care himself.

¶20    This court "defer[s] to the [trial] court's credibility determinations." *See* **Raymond C.**, 187 Wis. 2d at 14. In finding that Tyler failed to assume parental responsibility, the trial court clearly discredited Tyler's testimony in the face of ample testimony from other witnesses that Tyler did not engage with the children and care for them. The trial court stated:

> I think he was clear in his testimony when he said he didn't know about anything but the coffee pot. That was his level of care. I believe he spoke the truth…. [T]he evidence is clear, satisfactory and convincing that he didn't think he was the parent of these children for a number of years. It was put on the back of [Caroline] to care for these children, to bring in food and clothing for these children, put a roof over their heads.

This court defers to that credibility determination, and consequently, this court concludes that the trial court did not err when it found that Tyler failed to assume parental responsibility because he lacked a substantial parental relationship with the children.

¶21    Tyler last argues that the trial court erroneously weighed the factors at the disposition hearing and placed undue emphasis on his incarceration. In his argument, Tyler focuses his attention on the third factor, namely whether the

12

children have a substantial relationship with their father or other family members and whether it would be harmful to sever those relationships. *See* WIS. STAT. § 48.426(3)(c). Tyler argues that prior to his incarceration, he developed a substantial relationship with his children, and it was error for the trial court to disregard the relationship he developed with his children prior to his incarceration when it analyzed and assigned weight to this factor.

¶22 As a part of the disposition hearing, the trial court discussed whether Tyler had a substantial parental relationship with his children in relevant part saying:

> [H]e has not demonstrated to me and has not provided evidence to me that he was ever the caretaker for any of those children and these four children particularly who given some of their needs and how they are being addressed I don't find it to be a credible statement.… [T]hese past three years [the children] are in a place that filled the void of him being a parent. I think that's why the children refer to them, the foster parents, as mommy and daddy and they refer to [Tyler] as their father ….

The trial court found that there was "recognition of their biological connection" but not "a recognition of what he has done for them[.]" Thus, the trial court ultimately found that "yes, the children know who he is. They know that's my dad but beyond that it is different than someone who puts in the time as a caregiver."

¶23 The trial court also stated:

> [B]y his own statements he may have done some daycare while [Caroline] was out working but he wasn't working and he has demonstrated to the [c]ourt he has not been able to hold down a job consistently or housing consistently and frankly, he is still married to the mother of [Caroline] so he hasn't demonstrated to the [c]ourt that he is really ready, willing and able to in the future or near future to step up

13

and care for all four of these children. They have needs that are being met at this time.[8]

¶24 The record does not show that the trial court placed any undue emphasis on Tyler's incarceration. In fact, the trial court's exact words were that Tyler failed to demonstrate that "he was *ever* the caretaker." (Emphasis added.) The trial court's finding considered Tyler's relationship with the children from the time they were born and, contrary to Tyler's argument, was not focused on the time during which Tyler was incarcerated. Thus, this court concludes that the trial court did not err in its assessment of the third factor at the disposition hearing.

¶25 Moreover, this court concludes that the trial court did not erroneously exercise its discretion weighing the remaining applicable statutory factors—those factors weighed in favor of terminating Tyler's parental rights. *See* WIS. STAT. § 48.426(3).

¶26 The trial court addressed that the children were in foster placements that would also be adoptive resources if the parental rights were terminated. *See* WIS. STAT. § 48.426(3)(a) (stating "[t]he likelihood of the child's adoption after termination" as a factor to consider in determining the best interests of the child). The trial court also recognized that the needs of the children were being met since being removed from the parental home. *See* § 48.426(3)(b) (listing "[t]he age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home"). The trial court also addressed that the children had been removed from the care of their parents for approximately three

---

[8] This court construes the trial court's statement to mean that the children's needs were being met at the time of the hearing in their foster home placements.

years and "[t]hree years is a significant amount of time." *See* § 48.426(3)(e) (listing "[t]he duration of the separation of the parent from the child" as a factor).

¶27     Lastly, the trial court spent a significant amount of time on the stability that Tyler could provide for the children and whether the children would be in a more stable and permanent familial relationship if the parental rights were terminated. *See* WIS. STAT. § 48.426(3)(f) ("Whether the child will be able to enter into a more stable and permanent family relationship as a result of termination[.]").   The trial court stated that Tyler has to "get his life in order because he has a long road to go.  He has some things he has to address, getting his GED, going through anger management with a component of domestic violence…."   The trial court further recognized that Tyler has not maintained a stable home or employment saying:

> [H]e needs to work on getting housing and getting a job so he can care for himself and not rely on others to care for him, which seems to be the pattern here based on his testimony today about the number of people he has lived with but none of them for longer than two or three years ….
> I believe that the testimony from his probation officer … was that he wasn't interested and he wasn't very active in trying to find a job because he couldn't find one that fits his needs and that was good enough for him to work.

¶28     Thus, we conclude that the trial court did not erroneously exercise its discretion in terminating Tyler's parental rights given the number of factors that weighed in favor of termination.

> *By the Court.*—Orders affirmed.

This opinion will not be published.   *See* WIS. STAT. RULE 809.23(1)(b)4.

15