COURT OF APPEALS
DECISION
DATED AND FILED

October 11, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP1074**

STATE OF WISCONSIN

Cir. Ct. No.  2020TP160

IN COURT OF APPEALS
DISTRICT I

IN THE INTEREST OF T. L., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

A. A. L.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: ELLEN R. BROSTROM, Judge. *Affirmed.*

¶1    DUGAN, J.[1] Alexis appeals from an order of the trial court terminating her rights to her son, Tom.[2] On appeal, she argues that the trial court failed to appropriately consider the factors applicable to incarcerated parents when it found that the State proved both the continuing CHIPS[3] and failure to assume parental responsibility grounds alleged in the termination of parental rights (TPR) petition. This court disagrees and concludes that the trial court appropriately considered Alexis's incarceration as it applies to both the conditions for Tom's return and whether Alexis established a substantial parental relationship. Upon review, this court affirms.

## BACKGROUND

¶2    The State filed a petition to terminate Alexis's parental rights on July 30, 2020, alleging the two grounds of continuing CHIPS and failure to assume parental responsibility. Alexis contested the petition, and the case proceeded to a court trial on October 25, 2021. The following facts are taken from the testimony given by Alexis, an initial assessment worker, and Alexis's case managers at the grounds hearing.

¶3    Tom was born on February 18, 2019, at a hospital in Illinois. During her hospital stay, the hospital staff observed odd behaviors from Alexis, including a preoccupation with a light buzzing in her room, an obsession with making sure

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] To maintain the confidentiality of these proceedings, this court adopts the pseudonyms given to the mother and child in the briefs.

[3] CHIPS is a commonly used abbreviation for child in need of protection or services.

the baby was not choking, and repeatedly wrapping and unwrapping the baby. Alexis additionally provided different answers as to where she was currently living—at one point Alexis reported she was living with a family member in Chicago, and at another point Alexis stated that she was living in Milwaukee.

¶4    As a result, the hospital staff refused to discharge Tom to Alexis. The hospital staff also became concerned that Alexis intended to flee the hospital with Tom after Alexis asked questions about alarms and the staff overheard Alexis on the phone saying that they know the baby is here. The hospital staff had Alexis psychologically evaluated and also contacted the Division of Milwaukee Child Protective Services (DMCPS) to evaluate Alexis.

¶5    Based on the hospital's referral, a DMCPS initial assessment worker evaluated Alexis and decided to remove Tom from Alexis's care based on concerns over Alexis's mental health and a history of domestic violence. During conversations with Alexis, the initial assessment worker observed that Alexis's thoughts were scattered and disorganized and speaking to Alexis "was very much like speaking to a child." The worker also noted during her evaluation that Alexis was previously involved with DMCPS for her older children and that DMCPS records showed that Alexis had a history of mental illness and domestic violence in her home.[4] As a result of the worker's decision, Tom was placed with a foster family immediately upon discharge from the hospital, and he has lived with a foster family throughout these proceedings.

---

[4] Alexis's older children were removed from her home as a result of these same concerns.

¶6      After the initial assessment, Alexis's case was transferred to a case manager, and the case manager began providing services to Alexis.[5]  She arranged for supervised visitation in Alexis's home with a parenting education specialist. She also provided services specifically tailored to the concerns related to Alexis's mental health and history of domestic violence.

¶7      However, the case manager testified that Alexis generally avoided the topic of domestic abuse and denied that it was an issue in her life.  Therefore, Alexis did not participate in the domestic violence services that the case manager discussed with Alexis because, as the case manager explained, she cannot force a parent to engage.  The case manager further testified that, despite indications to the contrary, Alexis denied maintaining a relationship with Tyler, the father of one of her older children, who was also possibly Tom's father, and that DMCPS documented that he had been violent towards Alexis and her older children in the past,[6] and that Alexis did not acknowledge any domestic violence in any of her past relationships.

¶8      The case manager did testify, however, that Alexis did eventually complete a psychological evaluation.  Nevertheless, the case manager described

_____

[5] Alexis's first case manager had been involved as Alexis's case manager in the cases for Alexis's older children, and Alexis's conditions for the return of her older children were similar to the conditions of return that Alexis had in this case for Tom's return.  Consequently, the case manager had already connected Alexis with domestic violence resources, such as services through Sojourner Truth, and Alexis confirmed during her testimony that she was aware of domestic violence resources, such as Sojourner Truth, and had worked with them in the past.

[6] Alexis originally reported to the hospital that Tyler was Tom's father, and the initial assessment worker indicated that Tom was potentially going to be given Tyler's last name. Alexis later denied that Tyler was Tom's father, but she also never identified any one else as Tom's father.  Genetic testing was denied during the CHIPS proceedings, and it is currently unknown if Tyler is Tom's biological father.

that it took several months to complete because of Alexis's lack of cooperation, and there was even one appointment that was rescheduled because Alexis repeatedly fell asleep during the evaluation. Alexis also engaged in therapy services that the case manager arranged, but the case manager continued to have concerns about Alexis's "mood stability" because every day "was something different" and her mood "was constantly fluctuating."

¶9 Alexis's case was transferred to several other case managers, each of whom testified in a similar fashion. Namely, each case manager testified to ongoing concerns with Alexis's mental health and domestic violence in her home. The case managers testified that Alexis was generally participating in mental health services, but Alexis continued to demonstrate erratic moods and disorganized thoughts. Thus, the case managers continued to have concerns about Alexis's mental health.

¶10 Additionally, the case managers testified that Alexis continually denied that domestic violence was an issue in her home, and the case managers had persistent concerns that Alexis was not being forthcoming about her relationship with Tyler. Indeed, as evidence that domestic violence persisted in Alexis's home, one of the case managers testified that Alexis presented at one of her visits with a black eye, and when asked about the cause of her black eye, Alexis claimed that it was caused by allergies to cats. Another case manager testified that Alexis could not provide insight into a healthy relationship.

¶11 After several months, Alexis was arrested at the end of October 2019. As Alexis testified, Tyler kicked down the door to her apartment, and the two argued. She further testified that she grabbed the gun that she kept in her apartment, she fired multiple shots, and she shot Tyler in the back. Alexis testified

that Tyler was not living in her apartment at the time of this incident, but she admitted that she had lived with him in the past. Further questioning on the topic elicited that, just prior to the shooting incident, Alexis threw several belongings out of the apartment window that were thought to belong to Tyler.

¶12 Following her arrest, Alexis was incarcerated from the end of October 2019 until she was released in April 2020 as a result of COVID protocols.[7] Alexis was then sentenced on July 2, 2020, to four years of imprisonment, composed of two years of initial confinement and two years of extended supervision.

¶13 During Alexis's periods of incarceration, her case workers testified that they were unable to provide services directly to Alexis, but they were able to stay in contact with Alexis during her incarceration and work with Alexis's social worker at the institution to provide services to Alexis. Through this arrangement, Alexis was signed up for programming related to her conditions for Tom's return, and she was able to participate in mental health services, which included therapy and medication management. Alexis's case managers also received records for the mental health treatment that Alexis received during her incarceration. Alexis additionally confirmed that she participated in therapy and medication management, and she was signed up for other services while incarcerated.

¶14 As a result of her incarceration, however, Alexis was unable to maintain in-person visitation with Tom. Nevertheless, Alexis testified that she was able to send drawings and letters to Tom, and she further testified that she

---

[7] Alexis gave birth to her fourth child during her release. She denied that Tyler was also the father of her fourth child.

tried to maintain contact with Tom through phone calls to the foster family. Alexis testified that Tom's foster mother was rejecting her phone calls, but the case managers testified that Tom's foster mother was willing to accept calls from Alexis.

¶15 After considering the testimony at the grounds hearing, the trial court found that the State proved both grounds alleged in the petition, and accordingly, it found Alexis to be an unfit parent.[8] In explaining its decision, the trial court acknowledged that it was a positive that Alexis participated in supervised visitation with a parenting coach. It also acknowledged that Alexis did eventually complete her psychological evaluation. However, the trial court noted several concerns. As to Alexis's mental health, the trial court found that Alexis "does have some significant, mental health challenges." Also, in terms of domestic violence, the trial court stated that "there was only really so much [her case managers] could do. [Alexis] had to be willing to engage in domestic violence counseling, and that has just been very difficult for [Alexis] to grapple with[.]"

¶16 As it related to the conditions for Tom's return, the trial court did note that Alexis failed to meet some of the conditions as a result of her incarceration, and it also noted that Alexis did meet some of the conditions of return, such as commit no new crimes and resolve her criminal cases. However,

---

[8] As will be discussed in more detail below, the CHIPS dispositional order listed the following conditions that Alexis was required to meet to have Tom returned to her care: (1) control her mental health, (2) not allow violence in her home or in front of her children, (3) supervise Tom and place his needs above her own, (4) have age appropriate expectations for Tom, (5) keep a safe and clean home, (6) meet Tom's medical needs, (7) resolve her criminal cases and commit no crimes, and (8) provide safe care for Tom.

the trial court stated that Alexis has "got to meet all the conditions for safe return." The trial court then found that Alexis failed to meet certain conditions as a result of the ongoing concerns related to her mental health and domestic violence.

¶17     The trial court noted that Alexis remained in good contact with her case workers while she was incarcerated, but it was nonetheless difficult to provide services to Alexis, stating that "unfortunately there were—there was a pretty significant period of time where [Alexis] was either on a wait list [or] was deemed not eligible yet base[d] on release date, but that was the best unfortunately that could be done." Despite her incarceration, though, the trial court recognized, "It seems like [Alexis] may be starting to get some traction … on her mental health issues while incarcerated. It sounds like she has recently been pretty engaged with some treatment and has begun medication management[.]" Nevertheless, the trial court found that Alexis's efforts were not accomplished by the time Tom had been placed outside her home for fifteen months, and despite her recent efforts, she still continued to struggle with her mental health. Thus, Alexis failed to meet the conditions to control her mental health and to safely parent Tom and put Tom's needs before her own.

¶18     The trial court further stated that "[i]t's been challenging" for Alexis to acknowledge the "depth of violence" that has occurred in her life, and thus, Alexis failed to meet the condition that she not allow violence in her home and to provide a safe place for Tom. Here, the trial court found it telling that, when Alexis was in the community, she showed up to a visit with a black eye and kept a loaded gun in the apartment where her visits with Tom were occurring.

¶19     As to the failure to assume parental responsibility grounds, the trial court found that Alexis provided a hazardous living environment and stated, "One

is not providing or capable of providing the daily supervision, education, protection, and care of a child if the living environment is hazardous." The trial court found that Alexis failed to provide for Tom from the beginning when she failed to seek proper prenatal care, and that this failure continued when, for example, Alexis presented at a visit with a black eye. Overall, the trial court stated, "She was intending to parent, but given the mental health issues and the domestic violence[,] I don't think she could have done so safely[.]"

¶20   The trial court also found that Alexis was generally uninvolved in Tom's life—both prior to and during her incarceration—because Alexis failed to maintain contact with Tom's foster family, Tom's medical providers, and Tom's daycare. Thus, the trial court found that the State proved that Alexis failed to assume parental responsibility.

¶21   The case proceeded to the disposition, after which the trial court found that it was in Tom's best interest to terminate Alexis's parental rights. Alexis now appeals. Additional relevant facts will be set forth below as needed.

## DISCUSSION

¶22   "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. On appeal, Alexis argues that the trial court erred when it found the State proved the grounds alleged in the TPR petition. Thus, this appeal concerns only the first phase of the TPR proceedings.

¶23   In the first phase, called the "grounds" phase, "the petitioner must prove by clear and convincing evidence" that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists. *Steven V.*, 271 Wis. 2d 1, ¶¶24-25; *see*

9

*also* WIS. STAT. § 48.31(1). If the petition is contested, as it was here, "[t]he first step of the proceeding is the fact-finding hearing," the purpose of which is "to determine whether grounds exist for the termination of parental rights." ***Tammy W-G. v. Jacob T.***, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854 (citation omitted). The trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2).

¶24 Turning to Alexis's specific arguments, Alexis argues that the trial court did not appropriately consider the impact her incarceration had in these proceedings. First, as to the continuing CHIPS ground, Alexis argues that the trial court did not consider the appropriate factors for an incarcerated parent when it considered her ability to meet the conditions for her son's return—basing her failure solely on her incarceration—and that it was impossible for her to meet the conditions because of her incarceration. Second, as to the failure to assume parental responsibility ground, Alexis argues that the trial court failed to consider all the factors enumerated in WIS JI—CHILDREN 346B when it found that she failed to assume parental responsibility for her son. This court disagrees. Each argument is addressed in turn.

## I. Continuing CHIPS Grounds

¶25 For continuing CHIPS, the State was required to prove that Tom was a child in need of protection or services under a relevant court order containing a TPR notice, that DMCPS made a reasonable effort to provide services to Alexis to meet the court-ordered conditions for Tom's return, and that Alexis failed to meet

the conditions for Tom's return.[9]  *See* WIS. STAT. § 48.415(2)(a).  In this case, the CHIPS dispositional order listed the following conditions that Alexis was required to meet to have Tom returned to her care:  (1) control her mental health, (2) not allow violence in her home or in front of her children, (3) supervise Tom and place his needs above her own, (4) have age appropriate expectations for Tom, (5) keep a safe and clean home, (6) meet Tom's medical needs, (7) resolve her criminal cases and commit no crimes, and (8) provide safe care for Tom.

¶26      In evaluating whether Alexis had met the conditions of return, Alexis argues that the trial court failed to consider additional factors provided in *Kenosha County DHS v. Jodie W.*, 2006 WI 93, 293 Wis. 2d 530, 716 N.W.2d 845, as protection for incarcerated parents where "her incarceration renders certain of the conditions impossible to achieve."  Alexis contends that the trial court found that she failed to meet certain conditions of return solely based on her incarceration, and the trial court failed to consider the facts and circumstances particular to her when it evaluated other of the conditions.  Whether the trial court erred in finding that Alexis failed to meet the conditions of return based solely on her incarceration is a question of law that this court reviews independently.  *See id.*, ¶19.

¶27      This court disagrees with Alexis's argument; rather, it concludes that the trial court did not improperly base its finding solely on Alexis's incarceration.

---

[9] As the parties stipulated below, there was no prospective element as to whether Alexis could meet the conditions for Tom's return by any future date because Tom had been placed outside Alexis's home for fifteen of the most recent twenty-two months by the time of the grounds hearing that was held on October 25, 2021.  *See* WIS. STAT. § 48.415(2)(a)3.  Thus, this court does not address whether Alexis could meet the conditions for Tom's return at any future date.

As evidenced by the testimony and the trial court's findings, it was not solely Alexis's incarceration that led to Alexis's inability to meet the conditions for Tom's return. *See id.*, ¶49 ("[A] parent's failure to fulfill a condition of return due to his or her incarceration, standing alone, is not a constitutional ground for finding a parent unfit."). Rather, it was Alexis's ongoing mental health and domestic violence concerns that existed prior to and independent of Alexis's incarceration that led to the trial court's finding that Alexis failed to meet the conditions for Tom's return. *See id.* (requiring "an individualized determination of unfitness").

¶28 At the grounds hearing, the case managers provided extensive testimony as to ongoing concerns with Alexis's mental health that led to Alexis's inability to meet conditions for Tom's return, including the conditions that Alexis control her mental health and provide safe care for Tom. The first case manager testified that it took Alexis months to complete the psychological evaluation, in large part as a result of Alexis's lack of cooperation where Alexis did not show up for appointments and was falling asleep during another appointment. She also testified that Alexis engaged in therapy, but Alexis continued to exhibit unpredictable moods. Another of Alexis's case managers testified that Alexis was engaged in mental health services—including therapy and medication management—during her incarceration; however, the case manager testified that "[t]here was often some disorganized thoughts during our conversations and some kind of erratic emotions that would play out that would kind of calm down by the end of [the] phone call." Thus, in spite of the mental health services Alexis participated in, some of which occurred during Alexis's incarceration, the testimony overall demonstrated that Alexis failed to make improvement with her mental health.

¶29    The trial court also recognized during its findings that Alexis had significant mental health challenges but "may be starting to get some traction … on her mental health issues while incarcerated."  Yet, the trial court further found that the testimony overall showed that Alexis's recent efforts still failed to make the progress needed to say that Alexis was controlling her mental health and was able to safely parent Tom and provide for his needs.  Thus, the trial court's finding that Alexis failed to meet these conditions of return was not based solely on her incarceration; rather, the court considered other factors, such as Alexis's participation in services and her ability to maintain a safe and healthy relationship with her son.  *See Jodie W.*, 293 Wis. 2d 530, ¶50 (requiring consideration of a parent's relationship with the child and level of cooperation with services).

¶30    Next, as it related to the ongoing concerns of domestic violence, Alexis's first case manager testified that she was unsuccessful in providing services related to domestic violence to Alexis—in this case as well as her prior cases—because Alexis "usually avoided or denied" the topic.  Alexis's additional case managers similarly described that Alexis continued to avoid or deny the topic of domestic violence.  As one case manager testified, Alexis "minimized" the role domestic violence played in her life and Alexis continued to struggle with defining a healthy relationship.  Alexis's continued avoidance and denial of any domestic violence in her life existed prior to and independent of Alexis's incarceration, and as the trial court found, Alexis continued to lack insight into the role domestic violence played in her life from the beginning of her case and throughout her incarceration.  It was this lack of insight, and not Alexis's incarceration, that led the trial court to find that Alexis failed to meet the conditions of return, such as do not allow violence in front of your children and provide a safe home.

¶31    Contrary to **Jodie W.**, Alexis's case is not one wherein the conditions of return were impossible for her to meet as a result of her incarceration, nor was there a lack of findings regarding Alexis's parental deficiencies independent from her incarceration. *See id.*, ¶¶53-54. Instead, the testimony and the trial court's findings demonstrate that Alexis failed to maintain a safe home while in the community as demonstrated by, for example, her black eye at one of Tom's visits and the loaded gun she kept in her apartment. Additionally, Alexis failed to seek prenatal care and show that she would generally provide for Tom's needs when Alexis failed to be involved with Tom's medical care and other daily activities.

¶32    "[T]ermination should not be based on the parent's incarceration alone[.]" *Id.*, ¶48. Here, the testimony and the trial court's decision demonstrate that Alexis's incarceration was not the sole basis of the trial court's decision and thus the trial court committed no error when it found that the State proved the continuing CHIPS ground.

## II.    Failure to Assume Parental Responsibility Grounds

¶33    As to the failure to assume parental responsibility ground, the State was required to prove that Alexis did not have "a substantial parental relationship" with Tom. *See* WIS. STAT. § 48.415(6)(a). A substantial parental relationship within the meaning of the statute "means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). Factors to be considered in evaluating whether a parent has a substantial parental relationship with a child include:

> whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support

14

> for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

*Id.* "[A] fact-finder must look to the totality-of-the-circumstances to determine if a parent has assumed parental responsibility" and "should consider the circumstances that have occurred over the entirety of the child's life." *Tammy W-G.*, 333 Wis. 2d 273, ¶22.

¶34     Here, Alexis argues that the trial court failed to consider the factors contained in WIS JI—CHILDREN 346B when it found that she failed to assume parental responsibility.[10]  This court disagrees.  Importantly, the instruction states, "In determining whether an incarcerated parent has or does not have a substantial parental relationship with the child, in addition to the considerations indicated in other parts of this instruction, *you may consider* the following factors[.]"  *Id.* (emphasis added).  The instruction then lists that certain facts that may be considered include "[a]ppropriate efforts to communicate with the child or those responsible for the care and welfare of the child"; "[r]equests or absence of requests for information relating to the child's education, health and welfare"; and "[r]esponsiveness or lack of responsiveness of the parent to efforts, if any, of others to involve the parent in the life of the child." *Id.*

---

[10]  This court observes that Alexis contends that WIS JI—CHILDREN 346B "codified" the factors in the jury instruction and therefore the trial court was required to consider the factors in this jury instruction.  However, as the jury instruction itself recognizes, the factors listed in the instruction are considerations that may be considered in addition to the statutory requirements. *See* WIS JI—CHILDREN 346B.  The factors in the instruction, therefore, are not codified requirements, and the focus remains on the statutory requirement of establishing a substantial parental relationship. *See* WIS. STAT. § 48.415(6).

¶35    Even though the trial court did not specifically relate its findings to the factors in the jury instruction, the trial court's findings demonstrate that it considered precisely these factors and what Alexis did, or did not do, to establish a substantial parental relationship with Tom despite her incarceration.  As the trial court found, Alexis failed to express concern for or interest in Tom's care and well-being from the beginning when she failed to seek proper prenatal care and that failure continued throughout Tom's life.  Alexis's case managers testified that, throughout the proceedings, Alexis indicated that she wanted to attend Tom's medical appointments, yet she never attended the appointments, by phone or otherwise.    Alexis likewise failed to remain updated on Tom's dental appointments and was uninvolved with Tom's daycare.  Alexis also testified that she tried to call Tom's foster mother on a regular basis but her calls were rejected. The trial court, however, found this testimony "contrary to all of the other testimony and information in the record about [Tom's foster mother's] willingness to stay connected with [Alexis] and allow her to speak with [Tom]."

¶36    Thus, the trial court considered such factors as Alexis's efforts to communicate with Tom and his providers, the absence of any requests from Alexis for information about Tom's daily activities and needs, and her responsiveness to efforts to involve Alexis in Tom's daily life.  *See* WIS JI—CHILDREN 346B.

¶37    Nevertheless, the focus remains on the statutory requirements, and as part of these requirements, "[t]he fact-finder may also consider whether a parent exposed her child to a hazardous living environment."  *See* ***Tammy W-G.***, 333 Wis. 2d 273, ¶22.  As the case managers testified, Alexis denied or avoided the topic of domestic violence and tried to minimize the role domestic violence played in her life.  The case managers, however, had reason to believe the problem persisted in Alexis's life.  For example, as noted, Alexis arrived at one of the visits

16

with a black eye and claimed that it was caused by allergies. Alexis was then involved in a shooting incident related to domestic violence and demonstrated that Alexis kept a loaded gun in her apartment. The trial court then emphasized this hazardous environment when it found Alexis failed to accept and exercise "significant responsibility for the daily supervision, education, *protection and care* of the child." *See* WIS. STAT. § 48.415(6)(b) (emphasis added).

¶38 This court, therefore, concludes that the trial court did not erroneously find that the State proved that Alexis failed to assume parental responsibility.

## CONCLUSION

¶39 In sum, this court rejects Alexis's arguments that the trial court erred when it found that the State had proved the continuing CHIPS and the failure to assume parental responsibility grounds alleged in the TPR petition. Accordingly, this court affirms.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.